**Elena CASTILLEJA et al., Plaintiffs-Appellees,**

v.

**SOUTHERN PACIFIC COMPANY, Defendant-Appellant.**

No. 28623.

United States Court of Appeals, Fifth Circuit.

May 21, 1971.

Rehearing Denied June 11, 1971.

------◆------

Ferd C. Meyer, Jr., Harper Macfarlane, San Antonio, Tex., for appellant.

Sidney Ravkind, Houston, Tex., Les Mendelsohn, San Antonio, Tex., for appellees.

Before GODBOLD, SIMPSON and MORGAN, Circuit Judges.

SIMPSON, Circuit Judge:

The parties in this wrongful death action are here for a second appearance, but this time the roles of appellant and appellee are reversed. On the prior appeal, appellants Ausencio Castilleja's widow and minor children (the present appellees) secured reversal of a judgment based on a jury verdict in favor of Southern Pacific Company and a new trial based upon an improper jury instruction not here at issue. Castilleja v. Southern Pacific Company, 5 Cir. 1969, 406 F.2d 669. Upon retrial the jury, under Rule 49(b), F.R.Civ.P., answered written interrogatories and returned a general verdict in favor of Mrs. Castilleja and her minor children in the amount of $90,000.00. Southern Pacific appealed and urges three asserted points of error in the second trial below. We affirm.

The deceased, Ausencio Castilleja, was fatally injured on January 5, 1966, in Guadalupe County, Texas, when a train of the Southern Pacific struck a truck in which he was a passenger at a grade crossing in the open countryside about three miles from Seguin, Texas. Both the driver of the truck, Johnny Ortiz, and the deceased were employees of

Economy Furniture Company, a retail establishment in Seguin and were delivering furniture to customers living outside town on the day of the accident. The decedent was Ortiz's helper. Ortiz survived the accident and gave testimony at the first trial. He was also a plaintiff. He did not perfect an appeal from the adverse verdict and was no longer therefore a party when the case was retried. Ortiz did not testify at the second trial, but his prior testimony was allowed to be read in evidence over objection by Southern Pacific counsel that there was no proof that he was beyond the jurisdiction of the court or otherwise unavailable to testify. The admission of this prior testimony forms the basis of appellant's first claim of error.

The second asserted error is that the court erred in instructing the jury they could find in favor of the plaintiffs, based on the railroad's operation of the train at an unsafe speed under the circumstances, over the railroad's objection that there was no evidence the train was proceeding at an inappropriate rate of speed, the operator of the truck being under a duty to stop before proceeding across the tracks.[1] This ground is based upon the submission of Special Interrogatory 2: "Did the defendant negligently operate the railroad engine at an unsafe speed under circumstances which proximately caused the death?" to which the jury answered "Yes".

Lastly, Southern Pacific maintains that the court erred in submitting to the jury the question of whether the grade crossing was extrahazardous and if so whether the railroad was negligent in so maintaining it, over its objection that the evidence was as a matter of law insufficient to permit submission to the jury of this issue. The jury answered in the affirmative an interrogatory to this effect with the additional finding that it proximately caused the death of Castilleja. (Special Interrogatory 3.)

The trial court's alleged errors in the three particulars related, the admission of Ortiz's prior testimony and the instructions to the jury on the questions of the train's speed and the hazardous nature of the crossing were preserved for our review by motion and for new trial and for judgment n. o. v. addressed to the trial court after verdict and thereupon denied.

## I. USE OF TESTIMONY FROM PRIOR TRIAL

When railroad counsel objected to the introduction of Ortiz's prior testimony, the court inquired of counsel for the appellees as to the whereabouts of Ortiz. Counsel informed the court that an attempt had been made to locate Ortiz and that it was learned he was working in Dallas, Texas, but that no information was available as to where he lived in Dallas. The trial was in San Antonio, Texas, in the Western District. The trial judge was entitled to notice judicially that the population of metropolitan Dallas is upwards of one million people, and that Dallas is in the Northern District of Texas, about 269 miles distant by highway from San Antonio. The court then allowed Ortiz's former testimony to be read to the jury without further predicate being required or attempted, after assuring appellant's counsel that the court would also receive any testimony taken at the first trial which was offered as rebuttal to any portion of Ortiz's testimony.

Appellant contends, on the basis of Rule 43(a), F.R.Civ.P., that Texas law is controlling on the question of admissi-

---

1. Southern Pacific relies on the Texas statute providing:
   "Whenever any person driving a vehicle approaches a railroad grade crossing, the driver of such vehicle shall stop within fifty (50) feet but not less than fifteen (15) feet from the nearest rail of such railroad and shall not proceed until he can do so safely when: * * *
   "(d) An approaching train is plainly visible and is in hazardous proximity to such crossing". Vernon's Ann.Rev.Civ. Stat. Art. 6701d, § 86.

bility of former testimony. Rule 43(a) provides:

"(a) *Form and Admissibility.* In all trials the testimony of witnesses shall be taken orally in open court, unless otherwise provided by these rules. All evidence shall be admitted which is admissible under the statutes of the United States, or under the rules of evidence heretofore applied in the courts of the United States on the hearing of suits in equity, *or under the rules of evidence applied in the courts of general jurisdiction of the state in which the United States court is held.* In any case, the statute or rule which favors the reception of the evidence governs and the evidence shall be presented according to the most convenient method prescribed in any of the statutes or rules to which reference is herein made. The competency of a witness to testify shall be determined in like manner". (Emphasis added)

Appellant directs our attention to several Texas cases contending that they demonstrate that Texas courts would require more proof of non-availability of a witness than mere statements of counsel. Houston Fire & Casualty Ins. Co. v. Brittian, Tex., 1966, 402 S.W.2d 509; Harris v. Reeves, Tex.Civ.App.1967, 421 S.W.2d 689; Moore v. Spencer, Tex.Civ. App., 1966, 399 S.W.2d 880; M-K-T RR v. Bush, Tex.Civ.App., 1958, 310 S.W.2d 404. Appellees concede on brief that Texas courts appear to require more proof of non-availability than occurred below. For their part, however, the appellees maintain that the question is governed by federal law and that under a liberal application of Rule 43(a), F.R. Civ.P., testimony from a former trial should be considered as the equivalent of a deposition taken under Rule 26(d), F.R.Civ.P., in determining admissibil-

ity.[2] This view is convincingly stated in Hertz v. Graham, S.D.N.Y., 1958, 23 F.R.D. 17, which cites Wigmore on Evidence, § 1401(a), for the proposition that "(a) There is on principle no distinction between a *deposition* and *former testimony* as to the conditions upon which either may be used at the trial". 23 F.R.D. 17, 25, n. 1. Further, in Williams v. Cox, 10 Cir. 1965, 355 F.2d 667, the court cited Rule 26(d) (3) and held that a federal district court properly considered in a hearing before it the testimony given by an attorney in a prior state habeas corpus proceeding, when the attorney was shown to reside more than 100 miles from the site of the federal proceedings.

It is customary in federal courts to accept statements of parties or counsel as to unavailability of witnesses as a predicate to the use of depositions taken under Rule 26, F.R.Civ.P. Stewart v. Meyers, 7 Cir. 1965, 353 F.2d 691; Frederick v. Yellow Cab Co. of Philadelphia, 3 Cir. 1952, 200 F.2d 483.

■ The record indicates that the court below was satisfied from the statements of counsel that Ortiz was not available as a witness before permitting introduction in evidence of his former testimony. It was within the discretion of the trial court to accept or reject counsel's representations. The court's action in accepting counsel's statement is not demonstrated to be error. We conceive this holding to be in keeping with the established policy of construing Rule 43(a) as favoring receipt rather than exclusion of evidence, Harrington v. C. I. R., 5 Cir. 1968, 404 F.2d 237. We stress also that no complaint is made that the court's action denied appellant the opportunity to cross-examine Ortiz, nor that counsel for appellees was misrepresenting the facts as to his whereabouts. The

2. Rule 26(d) (3) provides in part:
   "(3) The deposition of a witness, whether or not a party, may be used by any party for any purpose if the Court finds: * * * (2), that the witness is at a greater distance than 100 miles from the place of trial or

hearing, or is out of the United States, unless it appears that the absence of the witness was procured by the party offering the deposition."
As noted earlier, Dallas is outside the Western District of Texas and is more than 100 miles from the place of trial.

sole grounds of objection urged on us is the absence of adequate proof of the witness' lack of availability. Thus assuming that error is demonstrated in the abuse of the trial court's ruling, we view it as harmless error. It is suggested to us that since Ortiz, upon retrial, was no longer a party as he was at the first trial, that his testimony on retrial might have been less adverse to appellant. This argument was never clearly advanced before the trial court and appears to us to be conjectural and speculative.

It is our conclusion that the lower court's action in permitting the use of Ortiz's testimony from the prior trial was not an abuse of that court's discretion as to admission of evidence.

## II. UNSAFE SPEED

■ We deal next with Southern Pacific's contentions regarding the sufficiency to go to the jury of the evidence on the question of the train's unsafe speed. We determine that this issue was properly submitted to the jury. Since a single finding of negligence on the part of the railroad,—the jury finding that the train was operated at an unsafe speed under circumstances which were a proximate cause of Castilleja's death—formed a sufficient basis for the award of damages against the railroad, the verdict and judgment should be sustained without regard to the correctness of the additional finding of negligence as to the maintenance of the crossing in a hazardous condition. Analysis of the testimony and the other evidence leaves us in doubt as to whether there was sufficient evidence for submission of the latter issue to the jury. In our view of the case we need not and do not attempt to resolve this problem. We will discuss it briefly at a later point in this opinion.

■ The question of whether the train's speed was unsafe is one of fact,

dependent upon the surrounding circumstances, such as the location of the crossing, the presence of any obstructions to view and the condition of the crossing itself. See Texas and Pacific Ry. v. Midkiff, Tex.Civ.App., 1955, 275 S.W.2d 841; Gulf, Colorado & Santa Fe R. R. v. Parmer, Tex.Civ.App.1965, 389 S.W.2d 558.

In this case the evidence as to surrounding circumstances was sufficient to warrant submission of the question to the jury, and forms an ample basis for affirmance of the jury's award of damages.

The accident took place at a county road crossing of Southern Pacific's main line tracks a few miles east of Seguin, Texas. At this crossing the tracks run generally east and west. A train approaching the crossing from the east, as did the train here involved, comes out of a one degree 30 minute curve from the south, the center of the curve being approximately 1800 feet from the crossing. The curve ends about 1300 feet from the crossing and the tracks approach the crossing in a straight line from that point. There is an uphill grade such that the grade level at the center of the curve is approximately 14 feet lower than the grade level at the crossing. Testimony at the trial indicated that the center of the curve was the most distant point from which a westbound train could be seen from the crossing and that from that point the train in question probably reached the crossing in 20 seconds or less.[3] Testimony as to the actual speed of the train by the crew fixed it at 65 miles per hour. There was no evidence of an established speed limit but the railroad presented testimony that 65 miles per hour was appropriate for the type of train and track involved.

The county road taken by Ortiz and the deceased leads from a highway

---

3. By the writer's calculation, 65 miles per hour is the equivalent of 95.3 feet per second, so that 1800 feet would actually be traversed in 18.1 seconds, a very brief interval for observation and proctective action by a driver approaching the crossing on the road involved here.

roughly parallel to the tracks, and after a second turn again proceeds east, again parallel to the tracks and 75 to 100 feet south of them. The road next makes a 90 degree left turn to the north about 75 feet south of the crossing and proceeds over the crossing at an approximate right angle. The railroad's right of way is 150 feet wide, extending 75 feet in each direction, north and south, from the center of the tracks.

Ortiz's testimony at the first trial, introduced at the second, was that he and Castilleja had loaded the truck on the morning of the accident and that it was a full and heavy load. He also stated that they were on the way to make their first delivery to a customer's home when the accident occurred. The following is the portion of his testimony pertinent to the collision itself:

"Q  All right, sir. Now, when you stopped, Mr. Ortiz, after seeing the railroad track, what did you do, sir?

A  After I stopped?

Q  Yes, sir.

A  The second time?

Q  Yes, sir.

A  I looked both ways and saw that no train was coming.

Q  Now, after you looked both ways and saw no train was coming, what did you do?

A  I had to go real easy.

Q  Why is it you had to go real easy?

A  On account of the road too bumpy, and the railroad track was up high, pretty high.

Q  Now, your furniture truck, did it have light springs on it or heavy springs on it?

A  Oh, just the same as any other truck, I had to take it real easy.

Q  When you would go into bumps or juts, you would have to take it easy?

A  Yes.

Q  Is that why you were taking it easy on this road?

A  On account of the furniture, too; I had to take care of the furniture on this road, kind of bumpy and all.

Q  Now, you pulled up to or did you continue on in your vehicle; what gear were you in, by the way, when you—after you made the second stop, looked and then went forward to the track, what gear were you in?

A  I believe I was in low.

Q  And how were you—how were you negotiating the bumps in the road; that is, were you using your brakes, were you using your clutch; were you gunning it or what?

A  I was using my clutch, real easy.

Q  Now, tell the Court and jury what you did next. You eased up, you say, towards the railroad track.

A  Yes, sir.

Q  All right. Then what did you do, sir?

A  I went over the first rail, and I had to take it real slow, and I was just moving the truck when all of a sudden Chencho [4] yelled.

Q  What did he yell?

A  He yelled, 'Peachy, the train.'

Q  Did you hear anything about that time?

A  Almost the same time I heard the horn blowing on the train.

Q  Is that the first horn that you had heard being blown by the train?

A  Yes, sir.

Q  When you heard the horn being blown by the train, where were the—where were your front wheels on your truck?

A  Between the first and the second rail.

4. Chencho is identified elsewhere in Ortiz's testimony as a nickname for Castilleja.

Q What did you do then, Mr. Ortiz?

A I stepped on my gas.

Q What happened.

A The back tire started spinning.

Q You mean you weren't going forward?

A Yes, sir. I was going forward, but nearly, you know, it's dirt road and everything, and then on account there was gravel road started spinning the wheels, couldn't get out in time.

Q Which wheels were those?

A Back wheels.

Q Is that where the power was in your truck?

A Yes, sir.

Q Well, did you start going forward?

A Little by little.

Q Were you picking up speed?

A Yes, sir.

Q Then what happened?

A The train hit us."

Mr. Pomerantz, an officer and part owner of Economy Furniture Company, went to the crossing on the afternoon of the accident, and again on the day after. He testified as to the bumpy condition of the road becoming distinctly worse only after rounding the final curve leftward in a northerly direction before reaching the tracks. He further stated:

" * * * you can drive parallel to the railroad for a pretty good while before you notice there's a railroad there. You have to come to this and turn a corner before you can tell there's a railroad there. Then there's a bunch of brush and mess off back in this area the same way, and the same situation pretty much on both sides of it."

From photographs in evidence we note the presence of trees and high brush to the right side (east) of the road on the final turn approaching the crossing. This appears to be near the outer limits of the railroad's right of way. From a distance of at least 50 feet south of the tracks the view to the east is clear of trees or large foliage. The photographs however indicate that along the tracks and within the right of way there was scattered grass and brush at some points perhaps 3 to 5 feet high.·

Approximately 70 photographs of the scene were introduced in evidence. At least 16 of these purport to show an easterly view of the tracks from the vicinity of the crossing. They vary considerably as to quality and clarity of the view depicted. Some of the pictures, in our judgment, clearly warrant a jury determination that the relatively low brush present within the right of way required a level or higher line of sight eastward, rather than an unimpeded view downgrade. This would support an ultimate jury finding that the view of the train was obscured as it came out of the curve from the 14-foot lower grade level.

Twenty-two witnesses testified at trial. Seven (including the testimony of Ortiz) gave eyewitness accounts. As in the usual case, no two accounts were exactly the same, all differing to some extent as to details. Without further elaboration it suffices to say that the evidence as to the bumpy condition of the unpaved crossing, the presence of the curve in the tracks, and possible obstructions to view, including the vegetation and the difference in grade, was sufficient to create a jury question as to whether the train's speed [5] was unsafe. The jury resolved that question against the railroad. If the issue was fairly presented under appropriate instructions, the jury's verdict must stand.

5. It would add nothing of precedential value to engage in a further extended review and analysis of all the testimony of the numerous witnesses. The evidence was sufficient to sustain the jury's verdict as to unsafe and excessive speed, as the testimony already outlined shows, and no error of law is demonstrated. Abernathy v. Southern Pacific Company, 5 Cir.1970, 426 F.2d 512; Mullen v. Texas & Pac. Ry. Co., 5 Cir.1970, 425 F.2d 269.

We set forth the trial court's instructions on the question of the train's speed; the court instructed the jury as follows:

"Now the plaintiff was—it was alleged by the plaintiff that the defendant was operating the train at an unsafe speed under all the circumstances. With regard to this issue, you are instructed that the railroad employees must exercise ordinary care in regard to the speed which the locomotive is traveling as it approaches and crosses a country road. In determining whether the speed at which the train travels was safe or unsafe you should consider whether the vision of the train is obstructed as a traveler approaches the crossing, whether the country road or within the railroad right of way is rough causing a vehicle to precede (sic) slowly or divert the attention of a traveler and whether the crossing itself is rough, the rails raised above the level of the ground causing or requiring a vehicle such as the Economy truck to be driven slowly over it and if so, if this was the proximate cause of the collision. All of these items and any other of the testimony you have heard will be considered in connection with determining the rate of speed the train should be driven or what you think would be a safe speed under the circumstances in this case. You consider all of the evidence that you have heard about this crossing, and its condition, the condition of the road, as you find it to be, the nature of the crossing and the fact that it is a country crossing, the kind of road it is and the growth, if any, that interfered with it. All of that enters into whether or not the speed was excessive. You determine whether or not under the circumstances it was."

The jury answered the written interrogatories by finding (1) that the appellant negligently operated its train at an unsafe speed under the circumstances, and (2) that this negligence was a proximate cause of the collision causing the death of the plaintiffs-appellees' decedent, Ausencio Castilleja.

██ This was not inconsistent with the further findings of (1) lack of negligence on the part of the railroad in improper maintenance of the country road within the right of way and between its tracks, and (2) contributory negligence on the part of Ortiz. The negligence of Ortiz was of course not imputable to the decedent because of the jury's additional findings that Castilleja was a passenger, was not in charge of the truck and did not share joint control of its movements with Ortiz. Castilleja's duties on the trip were to aid in the loading, unloading and placement of furniture, according to Ortiz, the driver and Pomerantz, his employer.

██ Appellant's counsel argues the quoted instruction is inconsistent with the duty of drivers to stop at railroad crossings, and not to proceed until it can be done safely, imposed under Article 6701d, § 86, supra. This contention is without merit. The court specifically instructed the jury as to the duty to stop and submitted an interrogatory to the jury as to violation of this duty by Ortiz and its proximate causal relation, if any, to the accident. The jury finding that Ortiz was contributorily negligent is entirely consistent with contemporaneous negligence on the part of the appellant in the operation of the train at an unsafe speed, proximately contributing to bringing about the fatal accident. No inconsistency or impropriety was present in the court's instruction. The jury's answers to the interrogatories are likewise consistent.

Of course the jury's finding that the railroad was not negligent in failing to maintain the country road within the right of way in no way precluded its consideration of the actual condition of the crossing itself on the day of the accident in reaching its determination that the train's speed was excessive.[6] The

6. Such factors as the level of the tracks in relation to the road and the road's composition of loose gravel, and whether these conditions could have slowed traffic

conditions prevailing at that time governed the question of whether the speed was in fact unsafe. This determination necessarily involved consideration of all the surrounding circumstances, the condition of the crossing included.

The issue as to the train's unsafe speed was properly submitted to the jury, and the court's charge, considered in its entirety, delineated correctly the law governing the facts present in the case.

## III. THE EXTRA-HAZARDOUS CROSSING ISSUE

As we have already indicated in the opening paragraph of Part II of this opinion, our approval of the jury's findings of actionable negligence by reason of unsafe speed renders unnecessary a decision by us of the close question of whether the evidence was sufficient to go to the jury on Interrogatory number 3, the issue of maintenance of the crossing in an extra-hazardous condition, and the corollary question of whether the motions for new trial and for judgment n. o. v. as to this issue were correctly denied. Our standard of review in this connection is that we set forth in Boeing, Co. v. Shipman, 5 Cir. 1969 (in banc), 411 F.2d 365, 374–375.

It should perhaps be explained that this was a separate and unrelated issue from the issue already adverted to, as to which the jury absolved the railroad from negligence: whether or not the road across the railroad right of way and between the tracks at the crossing was negligently maintained by the defendant railroad. The latter issue was submitted because of a Texas statute providing that every railroad in the state (Texas) shall keep the portion of its roadbed over or across which any public or county road may run in proper condition.

The general rule laid down by the Texas cases, as we understand them, is that the placing of safety devices at crossings, such as flashing lights, bells, gates or a flagman, is governed ordinarily by statute or ordinance. If there is no such statutory requirement, safety devices may be omitted unless the nature of the crossing renders it extra-hazardous to motorists crossing the track. In such event a jury question may arise as to negligence in the maintenance of the crossing in such condition without suitable warning devices.[7]

In large measure the proof offered by the plaintiffs below bearing on this question consisted of testimony as to vegetation obstructing the traveler's view eastward as he approached the track. This testimony was countered by the railroad company by extensive oral testimony as to a clear view being possible and many photographs showing the sparsity of vegetation. The argument goes then, based on *Matthews*, supra, that testimony "at variance with physical facts is no evidence" and that the crossing was as a matter of law hence not extra-hazardous. As stated earlier, we will not attempt to resolve the very close question presented, as being unnecessary to our decision of this appeal. The jury's findings as to the train's unsafe speed, and its proximate causal relationship to the fatal accident amply support the judgment awarding damages against the railroad company. The judgment is

Affirmed.

---

or diverted the attention of drivers, as well as the general condition of the road, all bore on the question the jury was required to determine.

7. See, e.g., Missouri Pacific Railroad Company v. Owen, 5 Cir.1962, 306 F.2d 887;

Southern Pacific Company v. Matthews, 5 Cir.1964, 335 F.2d 924; Gulf, C. & S. F. R. Co. v. Pratt, Tex.Civ.App.1953, 262 S.W.2d 775, writ ref. n. r. e., for a fuller explication of the Texas jurisprudence involved.