MARGARET L. SIKYTA, APPELLANT AND CROSS-APPELLEE, V.
ARROW STAGE LINES, INC., APPELLEE AND CROSS-APPELLANT.
470 N.W.2d 724

Filed June 7, 1991.   No. 89-091.

Patrick W. Healey and K. Kristen Witter, of Healey,
Wieland, Kluender, Atwood, Jacobs & Geier, for appellant.

Thomas M. White, of Fitzgerald, Schorr, Barmettler & Brennan, for appellee.

HASTINGS, C.J., CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ., and COLWELL, D.J., Retired.

SHANAHAN, J.

Margaret L. Sikyta appeals from a judgment in the district court for Lancaster County on the verdict for Arrow Stage Lines, Inc., in her negligence action for bodily injury sustained when she, as a passenger in an Arrow bus, fell on account of the bus driver's sudden application of the bus' brakes. Sikyta claims that reversible error resulted from the instruction on contributory negligence based on Sikyta's standing in the moving bus and submission of assumption of risk as a defense under the circumstances.

## THE BUS TRIP

On the morning of November 10, 1984, Margaret Sikyta and her husband, Curtis, a "semiretired" contractor, were on a chartered Arrow bus which was carrying passengers from Ashland, Nebraska, to Lawrence, Kansas, for the Kansas-Nebraska football game that day. The bus departed Ashland at 7:30 a.m.

*Interior of the Bus.*

Passengers entered the bus through its right front door and stairwell, climbed three steps toward the driver's area, and then turned left into the bus' interior, which contained rows of double seats along an aisle which was 18 inches wide. Each bus seat had a shoulder-high back for a seated passenger. The bus' two right front seats, immediately adjacent to the stairwell, were separated from the stairwell by a waist-high metal partition and railing. Margaret and Curtis Sikyta were seated in the right front seats adjacent to the stairwell. Herman W. Campbell was driving the bus and its 42 passengers bound for Lawrence. At the extreme rear of the bus was a bathroom.

*The Accident.*

The bus was apparently moving in occasionally heavy southbound traffic on the highway. The day was clear with no moisture on the road surface. Some passengers noted that the

bus was being driven "fast," perhaps around 65 miles per hour, while others described the bus' operation as nothing unusual. Margaret Sikyta, located in the window seat near the stairwell partition, was reading a morning paper and from time to time glanced at the road ahead. Somewhere in the course of the trip, Margaret observed that the bus had closely followed a car for a "few miles." Curtis, seated next to Margaret, was generally concerned that the bus, somewhere "down the road," might become involved in an accident in view of the traffic and the bus' speed.

Later in the trip, which had now taken approximately 1½ hours, Margaret decided to use the bathroom in the rear of the bus. Since Sikytas' location afforded little space for an exit maneuver from the window seat, it was necessary that Curtis Sikyta stand and move into the aisle so that Margaret might then step into the aisle and proceed to the bus bathroom. After Curtis had positioned himself in the aisle, Margaret stood and turned "sideways," facing the left or driver's side of the bus as she steadied herself by holding the back of the front seat. Meanwhile, from his vantage point in the aisle, Curtis, standing while facing forward and looking through the bus' windshield, was able to see "everything out the front of the bus" and saw that the bus was overtaking a southbound "black car." When the bus was about 18 to 20 feet behind the black car, the car suddenly turned right to leave the highway. In Curtis Sikyta's view of Campbell's driving the bus, "there's no way I could tell whether he's going to hit a car or whether he's going to get slowed down in time or not." Campbell "slammed on" the bus brakes which "just threw everything about in the bus." When Campbell applied the bus brakes "suddenly," Margaret Sikyta "flew around and hit the dash and bounced down the steps head first." Curtis Sikyta grabbed the railing at the stairwell partition, but hit his head and shoulder on the bus windshield. Margaret landed in the stairwell with her head near the door and her feet on the stairs toward the driver. Curtis retrieved Margaret from the stairwell and assisted her to a seat as the bus continued toward Lawrence. As Curtis Sikyta later explained, he had feared that there would be an accident as a result of Campbell's driving, but "[n]ot necessarily that [black] car, with

another car." After Curtis had stepped into the bus aisle and had the opportunity to observe the imminence of a collision between the bus and the black car, apparently everything happened so quickly that he was unable to call out a warning to Margaret.

Among the passengers, only Curtis Sikyta noted the bus' proximity to the vehicle being overtaken. One passenger, who had peered forward down the aisle somewhere in the trip, observed that the bus, while overtaking a vehicle, was so close to the overtaken vehicle that the passenger was unable to see the rear license plate on the preceding vehicle. However, this passenger was unable to verify that the overtaken vehicle observed by the passenger was the same vehicle overtaken just before the sudden application of the bus' brakes and could not determine the time interval between the passenger's observation and the application of the brakes which led to Margaret Sikyta's fall, that is, the time element might have been a "second or five minutes later."

Although none of the other passengers, with the exception of Curtis Sikyta, saw Margaret fall into the bus stairwell, some passengers recounted their movements after Campbell "stepped on his brakes." In one passenger's description, "my head went down in my lap and my back hit against the seat in front of me." Another passenger was en route to the bus bathroom and had taken "about two steps when he [Campbell] put on the brakes, and I would have fallen, but I was able to grab ahold of the seat by me."

## MARGARET SIKYTA'S TRIAL
### Depositions and Sikyta's Back Problems.

In her deposition, Margaret Sikyta stated that she had never seen a physician for back pain before the bus accident, although she did state that she had seen Dr. William Fulcher for "pain in [her] hip area once" before the accident.

The morning that trial commenced, the parties' counsel met with the judge and discussed the prospects of a videotape deposition by Dr. Fulcher because the doctor would be performing surgery the next morning. The substance of the discussion was prospective use of Dr. Fulcher's deposition in

lieu of the physician's oral testimony adduced through his personal attendance at Sikyta's trial. Regarding a time for obtaining Dr. Fulcher's videotape deposition, the court inquired and commented:

What about this evening?

. . . .

. . . Well, I mean, this is in lieu of having him here. This is not a discovery deposition, this is a trial deposition. . . .

. . . .

. . . Would it be possible for us to talk to Dr. Fulcher's office and see if they would schedule that deposition . . . at the end of the day today? Is that agreeable with —

. . . .

. . . With everybody's agreement, I'll talk to him.

The judge, in counsels' presence, then telephoned Dr. Fulcher's office and talked with someone about the prospective deposition, but the content of that conversation is undisclosed.

Later that same day, the court remarked to counsel: "Gentlemen, it is now 4:15, and I know that you have a deposition to take tonight at 5 o'clock in this case. At this time, we will therefore be in recess until 9 o'clock tomorrow." In Dr. Fulcher's deposition taken at the doctor's office in Lincoln, Sikyta's lawyer conducted direct examination, Arrow's lawyer the cross-examination.

On the morning of the second day in the trial, Sikyta's lawyer sought to introduce the videotape deposition of Dr. William Fulcher, an orthopedic surgeon who had treated Margaret Sikyta. Dr. Fulcher's deposition was taken on the first day of Sikyta's trial. Sikyta's lawyer told the court that use of the Fulcher videotape deposition at trial was necessary and, concerning a showing of Dr. Fulcher's "unavailability," commented to the court and Arrow's counsel:

Well, I thought we dealt with that yesterday when we decided that we were going to proceed and take a videotape deposition for use at trial, because he [Dr. Fulcher] is unavailable due to surgery commitments this week, as he has advised me several times. I can't represent that he's out of the city, but I think that the Court has discretion . . . to permit use of videotape even if the

witness may technically be in the environs, if he's not able to be here at trial.

Arrow's counsel referred to Neb. Ct. R. of Discovery 32(a) (rev. 1989), which provides:

> (3) The deposition of a witness, whether or not a party, may be used by any party for any purpose if the court finds:
>
> . . . .
>
> (E) That such exceptional circumstances exist as to make it desirable, in the interest of justice and with due regard to the importance of presenting the testimony of witnesses orally in open court, to allow the deposition to be used . . . .

Arrow's lawyer then objected to use of the videotape deposition because Dr. Fulcher's "unavailability" had not been established as a "pre condition for use of [Dr. Fulcher's] deposition at trial." On the basis of the "representation" by Sikyta's lawyer, the court concluded that "Dr. Fulcher is presently in surgery and is in surgery today and unavailable to testify [and] that constitutes an exceptional circumstance, and, therefore, the deposition can be used under [Rule 32(a)(3)(E)]."

Dr. Fulcher testified that Margaret Sikyta had been his patient in 1981 when he found "severe degenerative arthritis" in Sikyta's low back at the fourth and fifth lumbar vertebrae depicted in x rays shown to the jury. In 1981 and later, in reference to Margaret Sikyta's injuries from the bus accident, Dr. Fulcher diagnosed Sikyta's condition as "lumbar radicular syndrome," that is, radiation of pain due to nerve irritation, as a result of Margaret Sikyta's arthritic condition. In Dr. Fulcher's opinion, Margaret Sikyta's condition had been "asymptomatic," but the bus accident aggravated any preexisting condition in Margaret Sikyta's lumbar spine; hence, Margaret Sikyta's permanent disability was caused by the bus accident.

On cross-examination, when confronted with her deposition denial of any back problem before the bus accident, Margaret Sikyta testified that she had "completely forgotten about" her previous back condition. As Margaret Sikyta explained, her family physician had referred her to Dr. Fulcher in 1981 on

account of her hip pain, a condition which she had mentioned in her deposition. Margaret's referral to Dr. Fulcher was prompted by her sister's death from cancer which had been accompanied by pain in the hip. Consequently, Margaret Sikyta had "completely forgotten about" her back problem, which was overshadowed by the possibility of cancer.

At the conclusion of Margaret Sikyta's case in chief, Arrow moved for a directed verdict. After the court overruled Arrow's directed verdict motion, Arrow presented its case in chief, which began with Dr. Patrick W. Bowman, an orthopedist who examined Margaret Sikyta at Arrow's request. Through his examinations, Dr. Bowman determined that Margaret Sikyta suffered from "cervical spondylosis . . . degenerative cervical disease or degenerative spine disease," which is manifested by symptoms such as "mechanical type achiness, aggravated by activity, relieved to some extent by rest and recumbency . . . ." However, when Dr. Bowman asked Margaret Sikyta whether she had "suffered from any of the symptoms," aforementioned, if we assume that Margaret Sikyta was versed in the medicalese used by Dr. Bowman, she answered that her "symptoms dated exclusively from that injury" sustained in the bus accident. Nevertheless, Dr. Bowman concluded that Margaret Sikyta suffered from "longstanding degenerative spine disease," which had existed "at least since 1981, and probably before that . . . ." Arrow called other witnesses, including the busdriver, Herman Campbell, who testified that the trip to Lawrence, Kansas, on November 10, 1984, was "uneventful" and "routine" and that he did not recall making a "sudden or abrupt stop" during the trip or Margaret Sikyta's being thrown into the bus stairwell.

*Instructions and Verdict.*

Over Margaret Sikyta's objection, the court instructed that Arrow claimed specific acts of negligence by Sikyta, which included her "standing while the bus was moving," and that if Arrow proved that Margaret Sikyta was standing in the moving bus, the jury should consider her contributory negligence in arriving at a verdict. Also over Sikyta's objection, the court submitted assumption of risk.

The jury returned a verdict in favor of Arrow.

Margaret Sikyta appeals; Arrow cross-appeals. We note that Sikyta's trial was disposed of on the basis that Arrow was a common carrier, a dispositional basis unchallenged in this appeal. In its review, an appellate court disposes of an appeal on the basis of the theory presented by the pleadings on which the case was tried. *Union Pacific RR. Co. v. Kaiser Ag. Chem. Co.*, 229 Neb. 160, 425 N.W.2d 872 (1988). Accord, *Rahmig v. Mosley Machinery Co.*, 226 Neb. 423, 412 N.W.2d 56 (1987); *Foltz v. Northwestern Bell Tel. Co.*, 221 Neb. 201, 376 N.W.2d 301 (1985).

### INSTRUCTIONS AND REVERSIBLE ERROR

In an appeal based on the claim of an erroneous instruction, the appellant has the burden to show that the questioned instruction was prejudicial or otherwise adversely affected a substantial right of the appellant. . . .

. . . .

Regarding the claim of prejudice from an instruction given or a court's refusal to give a tendered instruction, the given instructions must be read conjunctively rather than separately in isolation. If the instructions given, which are taken as a whole, correctly state the law, are not misleading, and adequately cover the issues submissible to a jury, there is no prejudicial error concerning instructions and necessitating a reversal. [Citations omitted.] "All instructions, read conjunctively, must correctly state the law, adequately state the issues, and not mislead the jury."

*Rose v. City of Lincoln*, 234 Neb. 67, 74-75, 449 N.W.2d 522, 528 (1989).

### CONTRIBUTORY NEGLIGENCE

A plaintiff is contributorily negligent if (1) the plaintiff fails to protect himself or herself from injury; (2) the plaintiff's conduct concurs and cooperates with the defendant's actionable negligence; and (3) the plaintiff's conduct contributes to the plaintiff's injuries as a proximate cause.

*Burns v. Veterans of Foreign Wars*, 231 Neb. 844, 850, 438 N.W.2d 485, 490 (1989). Accord *Jensen v. Archbishop Bergan*

*Mercy Hosp.*, 236 Neb. 1, 459 N.W.2d 178 (1990). See, also, *Mandery v. Chronicle Broadcasting Co.*, 228 Neb. 391, 423 N.W.2d 115 (1988).

> "One who is capable of understanding and discretion but fails to exercise ordinary care and prudence to avoid obvious danger is negligent or contributorily negligent." . . . "To determine whether conduct constitutes negligence, the invariable standard is reasonable care, although reasonable care is directly proportional to the danger inherent in the conduct and may vary depending on the circumstances."

*Rahmig v. Mosley Machinery Co., supra* at 452, 412 N.W.2d at 75. Accord, *Lynn v. Metropolitan Utilities Dist.*, 225 Neb. 121, 403 N.W.2d 335 (1987); *Anderson v. Union Pacific RR. Co.*, 229 Neb. 321, 426 N.W.2d 518 (1988).

In Sikyta's case, although the court instructed that Arrow had to prove Margaret Sikyta's contributory negligence, which, according to Arrow's specific allegations, included Sikyta's "standing while the bus was moving," the gist of the instruction is that, as a matter of law, Sikyta was negligent if she was merely standing in the moving bus. The question becomes: In and of itself, is a passenger's act of standing in a moving bus negligence?

As early as 1897, in *East Omaha Street R. Co. v. Godola*, 50 Neb. 906, 70 N.W. 491 (1897), this court affirmed a judgment for a plaintiff who was thrown from the platform of a streetcar owned by the defendant, which was "engaged in operating a suburban railway by means of electricity." 50 Neb. at 907, 70 N.W. at 491. Since a large number of people were in the car, the plaintiff was standing on the car's platform when the "train" sped into a curve at 12 miles an hour notwithstanding that 5 miles an hour was the maximum safe speed for negotiation of the curve. As one witness described the event: " 'They went around that curve at a pretty good hickory. There was several of them took a tumble; they rolled off like pumpkins.' " 50 Neb. at 908, 70 N.W. at 492. In *Godola*, the court held: "The plaintiff was not, as a matter of law, guilty of contributory negligence in riding upon the platform of the motor." 50 Neb. at 909, 70 N.W. at 492.

Next, in 1907, in *Coffey v. Omaha & C.B. Street R. Co.*, 79 Neb. 286, 112 N.W. 589 (1907), this court reviewed a wrongful death action in which a passenger, Nelson, was thrown from the defendant's streetcar and died as the result of striking the paved street. In affirming a verdict for the plaintiff, this court stated in *Coffey*:

> Defendant contends that, since Nelson chose to stand on the lower outside step of the platform . . . he was guilty of such contributory negligence as a matter of law . . . . [A] street railway company which permits the use of its platforms and steps for the carrying of passengers . . . is bound as a common carrier to use proper precaution for the protection of the passengers riding in such positions; and . . . we think it cannot be said to be negligence *per se* for a passenger to ride in such position.

79 Neb. at 289-91, 112 N.W. at 590.

In *Jacobs v. Milwaukee & Suburban Transp. Corp.*, 41 Wis. 2d 661, 165 N.W.2d 162 (1969), the Supreme Court of Wisconsin held that a passenger on a moving bus was required to use reasonable and ordinary care, such as utilization of available safety devices, for example, handles at the end of the bus' seats, and concluded that "an ordinary prudent person would not walk down a bus aisle without hanging on or being in a position to use devices provided to aid one in maintaining his [or her] balance on a moving bus." 41 Wis. 2d at 665, 165 N.W.2d at 164.

Similarly, in *Southeastern Greyhound Lines, Inc. v. Chumley*, 312 Ky. 154, 226 S.W.2d 777 (1950), the court considered the question of a plaintiff's contributory negligence when the plaintiff, standing in a bus aisle, was thrown about and injured when the bus came to a sudden stop. The *Chumley* court observed that the plaintiff, as a bus passenger, was required to "exercise the prudence and care for his own safety under the ordinary and usual exigencies attendant upon the circumstances." 312 Ky. at 160, 226 S.W.2d at 780. Cf. *Sanders v. New Orleans Public Service, Inc.*, 422 So. 2d 232 (La. App. 1982) (although a passenger stood up in the bus aisle preparatory to disembarking the bus, leaving the bus seat before the bus had stopped was not contributory negligence).

In Margaret Sikyta's case, the bus was equipped with a bathroom and, therefore, provided an implicit invitation for a passenger's use of the facility. Use of the bathroom required that a person walk to the facility at the rear of the bus; hence, one's walking to the bathroom was necessarily preceded by rising from a bus seat and standing preparatory to walking toward the bus bathroom. Whether there were safety devices available for Margaret Sikyta's use is undisclosed. Thus, we conclude that, in and of itself, a passenger's act of standing in a moving bus is not negligence. For that reason, the mere act of standing, without reference to attendant circumstances, cannot be classified as negligence on Margaret Sikyta's part. Yet, the trial court informed the jury that Margaret Sikyta's merely standing in a moving bus, if Arrow proved that act, constituted negligence on the part of Margaret Sikyta. Consequently, the court incorrectly instructed the jury that Margaret Sikyta was negligent as the result of her merely "standing while the bus was moving." That incorrect instruction was prejudicial to a fair disposition of Margaret Sikyta's negligence claim; hence, the instruction constituted reversible error.

## ASSUMPTION OF RISK

The court also instructed that Margaret Sikyta's "assumption of risk," if proved by Arrow, was a defense to Sikyta's negligence claim.

At the outset, we again point out that contributory negligence and assumption of risk are not Tweedledum and Tweedledee affirmative defenses. Not every negligence cause of action must necessarily produce a reflex action based on contributory negligence and assumption of risk as affirmative defenses. However, contributory negligence and assumption of risk, mutually asserted as defenses to a negligence action, seem to continue as problems in the trial of negligence actions, that is, if the number of recent appeals is any indication of an existing problem. Reviewing the nature of negligence and assumption of risk may alleviate that troublesome situation.

As Prosser points out:

> The whole theory of negligence presupposes some uniform standard of behavior. Yet the infinite variety of

situations which may arise makes it impossible to fix definite rules in advance for all conceivable human conduct. The utmost that can be done is to devise something in the nature of a formula, the application of which in each particular case must be left to the jury, or to the court. . . .

The courts have dealt with this very difficult problem by creating a fictitious person, who never has existed on land or sea: the "reasonable man of ordinary prudence."

. . . .

The courts have gone to unusual pains to emphasize the abstract and hypothetical character of this mythical person. He is not to be identified with any ordinary individual, who might occasionally do unreasonable things; he is a prudent and careful person, who is always up to standard.

Prosser and Keeton on the Law of Torts, *Negligence: Standard of Conduct* § 32 at 173-75 (5th ed. 1984).

In reference to assumption of risk, Prosser has stated:

[T]he plaintiff is aware of a risk that has already been created by the negligence of the defendant, yet chooses voluntarily to proceed to encounter it—as where he has been supplied with a chattel which he knows to be unsafe, yet proceeds to use it anyway; or where he proceeds to walk over debris on the sidewalk carelessly strewn and left there by a construction contractor. If these are voluntary choices, the plaintiff may be found to have accepted the situation, and consented to relieve the defendant of his duty.

. . . .

. . . Where [contributory negligence and assumption of risk] have been distinguished, the traditional basis has been that assumption of risk is a matter of knowledge of the danger and voluntary acquiescence in it, while contributory negligence is a matter of some fault or departure from the standard of conduct of the reasonable person, however unaware, unwilling, or even protesting the plaintiff may be. Obviously the two may coexist when the plaintiff makes an unreasonable choice to incur the

risk; but either may exist without the other.

Prosser and Keeton on the Law of Torts, *Negligence: Defenses* § 68 at 481-82.

Nearly half a century ago, in *Landrum v. Roddy*, 143 Neb. 934, 12 N.W.2d 82 (1943), this court recognized the distinction between contributory negligence and assumption of risk:

> [T]here is a clear distinction between the defense of assumption of risk and the defense of contributory negligence, notwithstanding they may arise under the same set of facts and may sometimes overlap. There is a line of demarcation which, if carefully scrutinized and followed, will allow the court to differentiate between them. Assumption of risk rests in contract or in the principle expressed by the ancient maxim, *"volenti non fit injuria,"* whereas contributory negligence rests in tort. The former involves a choice made more or less deliberately and negatives liability without reference to the fact that the plaintiff may have acted with due care, whereas the defense of contributory negligence implies the failure of the plaintiff to exercise due care.

143 Neb. at 946, 12 N.W.2d at 89.

The distinction between contributory negligence and assumption of risk was reaffirmed in *Rahmig v. Mosley Machinery Co.*, 226 Neb. 423, 450, 412 N.W.2d 56, 74 (1987), when we stated:

> " ' "One who knows of a dangerous condition, appreciates its dangerous nature, and deliberately exposes himself to the danger assumes the risk of injury from it." ' " *Rodgers v. Chimney Rock P.P. Dist.*, 216 Neb. 666, 670, 345 N.W.2d 12, 15 (1984). See Prosser and Keeton on the Law of Torts, *Negligence: Defenses* § 68 at 487 (5th ed. 1984) (" 'Knowledge of the risk is the watchword of assumption of risk' ").

> In contrast with contributory negligence (fault or breach of a duty to exercise such care as an ordinary prudent person would have exercised under the same or similar circumstances), assumption of risk " 'involves a choice made more or less deliberately and negatives liability without reference to the fact that the plaintiff may

have acted with due care . . . .' " *Sandberg v. Hoogensen*, 201 Neb. 190, 197, 266 N.W.2d 745, 750 (1978), quoting *Landrum v. Roddy*, 143 Neb. 934, 12 N.W.2d 82 (1943).

More recently, in *Mandery v. Chronicle Broadcasting Co.*, 228 Neb. 391, 398-400, 423 N.W.2d 115, 120 (1988), we observed:

There is a definite demarcation between assumption of risk and contributory negligence as affirmative defenses, a delineation which may be obscured, if not totally obliterated, by incorrect application of these distinctly different defenses.

. . . .

Before the defense of assumption of risk is submissible to a jury, evidence must show that the plaintiff (1) knew of the danger, (2) understood the danger, and (3) voluntarily exposed himself or herself to the danger which proximately caused the plaintiff's damage. [Citations omitted.] "[E]xcept where he expressly so agrees, a plaintiff does not assume a risk of harm arising from the defendant's conduct unless he then knows of the existence of the risk and appreciates its unreasonable character, or the danger involved, including the magnitude thereof, and voluntarily accepts the risk." *Jensen v. Hawkins Constr. Co.*, [193 Neb. 220,] 226, 226 N.W.2d [346,] 350-51 [1975].

As expressed in Prosser and Keeton on the Law of Torts, *Negligence: Defenses* § 68 at 487 (5th ed. 1984): " 'Knowledge of the risk is the watchword of assumption of risk.' Under ordinary circumstances the plaintiff will not be taken to assume any risk of either activities or conditions of which he has no knowledge. Moreover, he must not only know of the facts which create the danger, but he must comprehend and appreciate the nature of the danger he confronts. 'A defect and the danger arising from it are not necessarily to be identified, and a person may know of one without appreciating the other.' Knowledge of the general danger may not be enough, and some courts require knowledge of the specific risk that caused the plaintiff's harm. The standard to be applied is,

in theory at least, a subjective one, geared to the particular plaintiff and his situation, rather than that of the reasonable person of ordinary prudence who appears in contributory negligence. If, because of age or lack of information or experience, he does not comprehend the risk involved in a known situation, he will not be taken to consent to assume it. His failure to exercise ordinary care to discover the danger is not properly a matter of assumption of risk, but of the defense of contributory negligence."

This court has recognized that, in determining the applicability of assumption of risk, " 'The standard to be applied is a subjective one, of what the particular plaintiff in fact sees, knows, understands and appreciates. In this it differs from the objective standard which is applied to contributory negligence.' " *Makovicka v. Lukes,* 182 Neb. 168, 171, 153 N.W.2d 733, 735 (1967) (quoting from Restatement (Second) of Torts § 496 D, comment *c.* (1965)).

Thus, while contributory negligence is predicated on an objective standard involving a hypothetical, fictitious, or mythical person, namely, the reasonably or ordinarily prudent person, assumption of risk is predicated on a standard involving a very real person, namely, a particular plaintiff, and the plaintiff's voluntary exposure to a known danger caused by the defendant's negligence, although the plaintiff actually recognizes and understands the danger which proximately causes damage to the plaintiff. Consequently, this court concluded that assumption of risk was inapplicable in the following: *Vanek v. Prohaska,* 233 Neb. 848, 448 N.W.2d 573 (1989) (plaintiff's decedent lacked knowledge that defendant's vehicle was approaching from behind the decedent, who was jogging along the right side of a county road, although decedent may have generally known that her presence on the right side of the road was more dangerous than her being on the road's left side, which would have afforded a frontal view of oncoming traffic); *Cassio v. Creighton University,* 233 Neb. 160, 446 N.W.2d 704 (1989) (length of time during which plaintiff's decedent had been a scuba diver did not establish that decedent

knew the risks of diving alone at the time when decedent drowned); *Carnes v. Weesner*, 229 Neb. 641, 428 N.W.2d 493 (1988) (plaintiff's walking on ice which covered the only access to her automobile was not a voluntary exposure to danger); *Mandery v. Chronicle Broadcasting Co., supra* (plaintiff, unaware that joists were missing beneath a floor, walked on the floor, which, on account of its weakened condition, collapsed and injured plaintiff); *Rahmig v. Mosley Machinery Co.*, 226 Neb. 423, 412 N.W.2d 56 (1987) (plaintiff lacked knowledge about a design defect in a guillotine scrap shear which malfunctioned on account of the defect and traumatically amputated plaintiff's fingers). ·

In *Mandery v. Chronicle Broadcasting Co., supra*, we recognized that a plaintiff's knowledge of danger, as an element in assumption of risk, may be proved by circumstantial evidence, since knowledge is a state of mind or a mental process.

However, in our review of the record in Margaret Sikyta's case, we find no direct evidence that she knew and understood that sudden application of the bus' brakes was imminent to avoid a collision between Arrow's bus and the preceding automobile. Although Margaret Sikyta was aware of general traffic conditions that morning, she made no specific observation concerning any particular automobile ahead of the bus immediately before sudden application of the bus' brakes and was unaware of the preceding automobile's movement in turning from the highway as she commenced her walk to the bus bathroom. Thus, there is no evidence from which an inference might be drawn that Margaret Sikyta knew of imminent danger involving the bus as it overtook the preceding automobile and, notwithstanding her knowledge of that imminent danger, placed herself in a position to suffer the consequences of attempted extrication from the dangerous situation, namely, sudden application of the bus' brakes in an effort to avoid a collision. Hence, we conclude that Arrow did not produce sufficient evidence to warrant submission of assumption of risk and permit the jury to conclude that Margaret Sikyta knew of the immediate and specific danger involved in the bus' operation in relation to the overtaken

automobile, but, nevertheless, exposed herself to that danger which proximately caused her fall and injury. Therefore, on the basis of the record presented, the defense of assumption of risk should not have been submitted to the jury.

As a result of the improper submission of assumption of risk and instruction on that defense, the jury may have found that Margaret Sikyta assumed the risk, as claimed by Arrow. Consequently, the trial court's submitting assumption of risk was prejudicial to Margaret Sikyta's substantial right to a fair trial on her negligence claim and constituted reversible error.

## ARROW'S CROSS-APPEAL
*Arrow's Motion for Directed Verdict.*

Although error was committed in the instruction on contributory negligence and by submitting assumption of risk, Arrow contends that its motion for directed verdict, made at the conclusion of Margaret Sikyta's case in chief, should have been sustained. However, after the court overruled Arrow's directed verdict motion, Arrow presented its case in chief. A defendant who moves for a directed verdict at the close of evidence in the plaintiff's case in chief and who, when the court overrules the directed verdict motion, proceeds with trial and introduces evidence waives the appellate right to challenge correctness in the trial court's overruling the motion for directed verdict. See, *Lincoln Co. Sheriff's Emp. Assn. v. Co. of Lincoln*, 216 Neb. 274, 343 N.W.2d 735 (1984); *Church of the Holy Spirit v. Bevco, Inc.*, 215 Neb. 299, 338 N.W.2d 601 (1983); *Baker v. Blue Ridge Ins. Co.*, 215 Neb. 111, 337 N.W.2d 411 (1983). Arrow's assigned error regarding the directed verdict motion is without merit.

Since we have concluded that reversible error occurred in Margaret Sikyta's trial, ordinarily, we would not consider Arrow's remaining assignments of error. However, Arrow's assigned errors beyond the directed verdict question refer to matters which may recur on retrial or which should be of some general interest to bench and bar in trials involving use of a deposition from a witness characterized as "unavailable."

*Discredit of Margaret Sikyta's Testimony.*

Arrow claims that Margaret Sikyta's testimony concerning

her injuries is discredited as a matter of law. To support its position, Arrow refers to *State v. Robertson*, 223 Neb. 825, 828, 394 N.W.2d 635, 637 (1986):

> Where it is clear that a party as a witness, to meet the exigencies in pending litigation and without reasonable explanation, changes such witness' testimony and then testifies to facts materially different concerning a vital issue, the subsequent and altered testimony from such witness is discredited as a matter of law and should be disregarded.

See, also, *Momsen v. Nebraska Methodist Hospital*, 210 Neb. 45, 313 N.W.2d 208 (1981).

During trial, Margaret Sikyta offered an explanation for her inconsistent deposition statement concerning existence of her back problem before the bus accident, namely, the possibility of cancer caused Margaret to focus on her medical examination and treatment for pain in her hip and overlook previous medical attention to her back. We are unable to conclude, as a matter of law, that her explanation is unreasonable and, therefore, a basis for mandatory discredit of her testimony. Whether Margaret Sikyta's explanation is reasonable and preserves her credibility is a matter for a jury's evaluation concerning witness credibility or weight to be given a witness' testimony.

*The Fulcher Deposition.*

Finally, Arrow claims that there was an insufficient showing that Dr. Fulcher could not or would not personally appear in court to testify in the trial. In particular, Arrow contends that Sikyta failed to provide the trial court with a sworn factual basis, for example, an affidavit or testimony, for a determination whether a deponent was unavailable as a witness at trial.

Sikyta's lawyer never requested a subpoena for Dr. Fulcher's attendance at Sikyta's trial. See *United States v. Bowen*, 411 F.2d 923 (5th Cir. 1969) (witness, who previously testified in a deposition, could not be located for service of a subpoena to compel attendance at trial; deposition testimony was allowed). Rather, regarding prospective use of the Fulcher videotape

deposition as substantive evidence at trial, Sikyta's lawyer alluded to the absence of a subpoena for Dr. Fulcher as a result of some agreement or stipulation that the deposition could be used in place of testimony adduced through Dr. Fulcher's personal appearance in court. However, stipulated use of the Fulcher deposition as a substitute for the physician's testimony adduced through courtroom interrogation does not appear in the deposition. Hence, we must conclude that there was no stipulation for use of Dr. Fulcher's videotape deposition pursuant to Neb. Ct. R. of Discovery 32(a)(3)(E) (rev. 1989), although the circumstances, especially obtaining the deposition during trial, strongly suggest arrangements for more than a "discovery" deposition.

The Nebraska Discovery Rules for All Civil Cases, which became effective on January 1, 1983, are generally and substantially patterned after the corresponding discovery rules in the Federal Rules of Civil Procedure.

The tenor of Rule 32 is to prefer "live" testimony, that is, oral testimony adduced in a courtroom within the presence and hearing of a jury. Referring to Fed. R. Civ. P. 32, the court observed in *Klepal v. Pennsylvania Railroad Company*, 229 F.2d 610, 612 (2d Cir. 1956): "[S]olicitude [is] disclosed in the rules generally for trials on oral testimony and the disposition to avoid trial on depositions alone where it can properly be avoided or where injustice or unfairness will not result." See, also, Rule 32(a)(3)(F) (due regard to the importance of presenting the testimony of witnesses orally in open court).

However, Rule 32(a)(3) does allow use of a witness' deposition in certain situations. A party seeking to admit or use a deposition on the basis that the witness is unavailable must establish that the requirements of Rule 32(a)(3) are satisfied. *Rascon v. Hardiman*, 803 F.2d 269 (7th Cir. 1986). A showing of witness unavailability may be made through counsel's statements to the court. *Castilleja v. Southern Pacific Company*, 445 F.2d 183 (5th Cir. 1971). See, e.g., *Comeaux v. T. L. James & Co., Inc.*, 666 F.2d 294 (5th Cir. 1982); *Nanda v. Ford Motor Company*, 509 F.2d 213 (7th Cir. 1974); *United States v. Bowen, supra*; *Frederick v. Yellow Cab Co. of Philadelphia*, 200 F.2d 483 (3d Cir. 1952).

Determination that a witness is unavailable, thereby authorizing use of the witness' deposition pursuant to Rule 32(a)(3)(E), is within the discretion of a trial court, whose ruling will be upheld on appeal in the absence of an abuse of discretion. See *Castilleja v. Southern Pacific Company, supra*. See, also, *Pearl v. Keystone Consol. Industries, Inc.*, 884 F.2d 1047 (7th Cir. 1989); *Comeaux v. T. L. James & Co., Inc., supra*; *Huff v. Marine Tank Testing Corp.*, 631 F.2d 1140 (4th Cir. 1980); *Nanda v. Ford Motor Company, supra*; *United States v. Bowen, supra*.

Also, we note that Sikyta's lawyer stated that Dr. Fulcher had "advised me several times" that the physician would be occupied in surgery during the week of Sikyta's trial. The statements by Margaret Sikyta's lawyer certainly dispel any notion that use of Dr. Fulcher's deposition became a necessity as the result of an emergency or something unexpected or unforeseeable, such as a sudden summons to surgery. Under the circumstances, a predeposition application for use of a deposition under Rule 32(a)(3)(F) might have avoided some of the procedural turmoil and headache. Rule 32(a)(3)(F) provides that a deposition may be used

> [u]pon application and notice prior to the taking of the deposition, that circumstances exist such as to make it desirable, in the interest of justice and with due regard to the importance of presenting the testimony of witnesses orally in open court, to allow the deposition to be used.

Most curious is the fact that Dr. Fulcher was available for a late afternoon deposition, but no subpoena was issued for Dr. Fulcher's court appearance to give testimony in the jury's presence at the time when he was otherwise available for the deposition.

Consequently, we need not continue further into the propriety of using Dr. Fulcher's deposition in place of his testimony adduced through his personal appearance in the courtroom during Margaret Sikyta's trial. From our examination of the Fulcher deposition, we note that Arrow's lawyer extensively cross-examined Dr. Fulcher. Moreover, Arrow does not demonstrate that use of the Fulcher deposition deprived Arrow of a substantial right, prevented a just result, or

otherwise worked adversely or prejudicially to Arrow's case or defense. Arrow would be hard pressed to show deprivation of a substantial right or prejudice in light of the verdict favorable to Arrow. For that reason, we decline to delve further into the question about a proper procedure for showing that a witness is unavailable within the purview of Rule 32(a)(3)(E).

As a concluding comment about use of the Fulcher deposition, we recommend that trial courts abstain from involvement in the production or gathering of information pertinent to witness unavailability as a basis for use of a witness' deposition pursuant to Rule 32(a)(3). Such involvement not only complicates application of our standard of review, but presents unnecessary problems at the trial level in reference to a determination whether a witness is unavailable.

## CONCLUSION

As we have previously mentioned, there is reversible error in the trial of Margaret Sikyta's case. For that reason, we set aside the district court's judgment entered on the verdict and remand this cause to the district court for a new trial.

REVERSED AND REMANDED FOR A NEW TRIAL.