RONALD J. MARESH, PERSONAL REPRESENTATIVE OF THE ESTATE OF JOHN MICHAEL MARESH, DECEASED, APPELLEE, V. STATE OF NEBRASKA, APPELLANT.

489 N.W.2d 298

Filed September 18, 1992.    No. S-89-762.

Robert M. Spire, Attorney General, and Douglas J. Peterson for appellant.

J. Michael Fitzgerald, of Carpenter, Rowen & Fitzgerald, and R. Collin Mangrum for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, and FAHRNBRUCH, JJ.

HASTINGS, C.J.

The defendant, the State of Nebraska, appeals a judgment in favor of the plaintiff, Ronald J. Maresh, personal representative of the estate of John Michael Maresh, deceased. This was an action for damages alleged to have been suffered by reason of an automobile accident which occurred when the driver of the automobile in which decedent was riding drove off the shoulder of U.S. Highway 30 while it was under construction. The action was brought under the State Tort Claims Act, Neb. Rev. Stat. §§ 81-8,209 to 81-8,235 (Reissue 1987). The district court, sitting without a jury as required by § 81-8,214, awarded damages of $124,273.

The State on appeal assigns and argues as error the actions of the trial court in (1) failing to find that the State's discretionary function immunity, § 81-8,219(1)(a), precluded this lawsuit; (2) admitting into evidence the deposition testimony of plaintiff's expert witness William Berg, Ph.D.; and (3) determining that the manner in which the State attempted to mark the edge of the highway during the construction project constituted a breach of duty which was a proximate cause of the decedent's death.

In our review of a proceeding under the State Tort Claims Act, the findings of fact of the trial court will not be set aside unless such findings are clearly incorrect. *Koncaba v. Scotts Bluff County*, 237 Neb. 37, 464 N.W.2d 764 (1991). We affirm.

On May 16, 1987, at about 11:30 p.m., there was a four-vehicle accident on Highway 30, approximately seven-tenths of a mile west of Ames, Nebraska. The plaintiff's decedent was a passenger in one of the involved automobiles, which was driven by Sean Oelkers. The decedent was thrown from the automobile during the accident and died of the injuries which he sustained.

Sgt. Gurney K. Pittenger of the Nebraska State Patrol testified from his investigation notes of this accident, without objection, that the automobile in which the plaintiff's decedent

was riding was westbound on the highway. The vehicle veered and appeared to go off the road onto the north shoulder, and following an attempt to steer hard to the left to pull back onto the highway, the driver overcorrected and lost control of the vehicle. The vehicle veered across the highway into the path of an oncoming pickup truck, which struck Oelkers' car broadside on the passenger side, spinning the car around. The spin ejected Oelkers' passengers, including the plaintiff's decedent. The skid marks left on the pavement indicated that at the time Oelkers reentered the highway from the shoulder, he was traveling at 66 miles per hour.

Oelkers was unable to recall the accident or the events immediately preceding it without the aid of hypnosis. However, without hypnosis, he testified that on the day of the accident and on previous occasions he had driven through the Highway 30 construction area during daylight hours. Oelkers also testified that he "assumed" there was a dropoff at the edge of the pavement. He was aware of the danger of veering into the lane of oncoming traffic when reentering the roadway after dropping off a pavement edge. Oelkers' driver's education instructor testified that he had taught his students, including Oelkers, techniques for safely reentering the roadway after a pavement edge dropoff.

At the time of the accident, a private contractor engaged by the State was resurfacing Highway 30. At the site of the accident, the road surface was fresh asphaltic concrete, totaling 29 feet in width. Each traffic lane was 12 feet wide, with a 2½-foot paved shoulder. There was a 4- to 5-inch dropoff from the edge of the pavement shoulder to the unpaved dirt shoulder. Raised plastic markers delineated the centerline of the highway, but there were no markings setting out the edge of the highway or the edge of the paved shoulder. However, there were 6- by 12-inch reflective yellow panels, raised on posts, mounted 6 to 18 inches outside the edge of the pavement—every 300 feet. Additionally, there were large yellow-orange signs stating, "Sharp Drop-off at Pavement Edge," placed at intervals alongside the construction project area. A driver traveling west from the eastern end of the construction area to the site of the accident would have passed no fewer than six of these signs.

The plaintiff offered the deposition of Berg, primarily on the issue of the standard of care to which the State was to be held in planning, directing, and executing a highway construction project such as the project on Highway 30. The State objected to the admission of the deposition on the grounds that the deposition was hearsay and that there had been no showing of unavailability as required by Neb. Rev. Stat. § 27-804(2)(a) (Reissue 1989). The State did stipulate that Berg lived more than 100 miles from the place of trial. The district court admitted the deposition over the State's objection. However, because we find the trial court was in error in admitting this deposition testimony, as will be explained later, we make no further reference to Berg's testimony.

Offered and received in evidence without objection were exhibit 10, the U.S. Department of Transportation's Manual on Uniform Traffic Control Devices for Streets and Highways (1978) (manual), and exhibit 34, the U.S. Department of Transportation's Traffic Control Devices Handbook (1983) (handbook), to which reference will be made later.

The manual has been adopted by the Department of Roads as the State's rules and regulations "to provide a uniform system of traffic-control devices on all highways within this state." Neb. Rev. Stat. § 39-698 (Reissue 1988); 411 Neb. Admin. Code, ch. 1, § 001.01 (1989). See *Raben v. Dittenber*, 230 Neb. 822, 434 N.W.2d 11 (1989). At trial, the court received both the manual and the handbook into evidence without objection by the State, independent of Berg's deposition. The court also received portions of the Department of Roads' Standard Specifications for Highway Construction (1985) (standard specifications) and the Highway 30 project plans.

Section 507.05(2)(b) of the standard specifications provides as follows:

> When shown in the plans, temporary yellow Type II *object markers* shall be installed at the time of placement of the bottom layer of asphaltic concrete. These markers shall be placed at 300' intervals on both sides of the roadway either opposite each other or at staggered one-half (1/2) intervals on both sides. . . . The markers shall be firmly installed twelve inches plus or minus six

inches from the pavement edge at a minimum height of three feet from ground elevation to the base of the object marker. The object markers shall consist of six inch wide by twelve inch high base material with yellow reflective flat sheeting adhered firmly on both sides.

(Emphasis supplied.) Section 937.01(2) of the standard specifications provides that "[a]ll barricades, warning signs, lights, temporary signals, and other protective devices must conform with the latest edition of the Manual of Uniform Traffic Control Devices for Streets and Highways."

The project plans, in conformity to § 507.05(2)(b), state:

[W]hen an existing pavement is to be resurfaced and surfaced shoulders are not [in]cluded as part of the work, temporary yellow Type II markers shall be installed [at] the time of placement of the bottom [la]yer of asphaltic concrete. These markers [sh]all be placed at 300' intervals on both [si]des of the roadway, either opposite each [ot]her or at staggered one-half (1/2) [in]tervals on both sides.

[Th]ey shall be installed and maintained in [go]od condition and position until removal is [di]rected by the engineer.

The actual markings were in conformity to the standard specifications and the project plans.

The amended petition upon which the case was tried alleged that the State was negligent in failing to maintain Highway 30 in a reasonably safe condition, in failing to inspect the Highway 30 construction project, in failing to discover the unreasonably dangerous condition at the edge of Highway 30, in failing to adequately warn of the dropoff, and in failing to delineate the pavement edge. The State generally denied the allegations of the amended petition and asserted both its immunity from suit and the allegation that Oelkers' negligence was "the sole proximate cause of the accident or a contributing cause of the accident." The district court, on the evidence outlined herein, found that "the Defendant, the State of Nebraska, was negligent in failing to provide adequate warnings of the drop-off between the blacktop road and the shoulder at or near Milepost 491 on U.S. Highway 30." While the district court did not explicitly find

that the State was not immune, nor that the State's negligence was a proximate cause of the plaintiff's decedent's death, it implicitly resolved these issues against the State in ordering judgment in favor of the plaintiff.

The immunity issues raised by the State's first assignment of error would, if resolved in the State's favor, eliminate the need to consider the other two assignments. However, the posture in which this case comes before this court necessitates that the immunity question be answered last.

The State chose to raise the immunity issue as an affirmative defense to the amended petition. "The burden of proving an affirmative defense rests upon the defendant." *Spittler v. Nicola*, 239 Neb. 972, 977, 479 N.W.2d 803, 807 (1992). Thus, the immunity issue must be evaluated in light of the proof at trial, rather than upon the pleadings, as would be the case had the issue been raised by demurrer. See *Security Inv. Co. v. State*, 231 Neb. 536, 437 N.W.2d 439 (1989).

The question of the admissibility of the Berg deposition must be answered before the immunity issue can be considered, so that we may properly consider, or not consider, the deposition in evaluating the immunity issue. Likewise, the existence of any breach of duty must also be considered before immunity, because the theory upon which the plaintiff recovered in the district court was based, at least in part, upon the State's employees' failure to "exercis[e] due care, in the execution of a statute or regulation." § 81-8,219(1)(a). Therefore, we consider first the admissibility of the Berg deposition, and second, the sufficiency of the admissible evidence to sustain the judgment, and last, the claim of immunity.

As to the admission of the deposition of Berg, the State claims the court erred in this respect because the plaintiff made no preliminary showing of unavailability of the deponent. Unavailability, as is relevant here, requires that the deponent be "absent from the hearing and the proponent of his statement has been unable to procure his attendance by process or other reasonable means." § 27-804(1)(e). The Nebraska Evidence Rules provide that a deposition may be admitted only if it was taken subject to cross-examination by the party opponent, and only if the witness is unavailable. § 27-804(2)(a).

On the other hand, plaintiff argues that the deposition was properly admitted under Neb. Ct. R. of Discovery 32(a)(3) (rev. 1992). That rule, as applicable here, allows the admission of a deposition where the party opponent was either present at the deposition or properly notified thereof and where the deponent is either more than 100 miles from the site of the trial or beyond the trial court's subpoena power at the time of trial. The plaintiff further argues that since the State stipulated that Berg resided more than 100 miles from the district court site, his deposition is admissible without further inquiry.

The requirements for admissibility of a deposition under § 27-804 and under rule 32 are clearly in conflict. The 100-mile limit and the area within which process may be served are not necessarily congruent. The district court may issue a subpoena to any person within the state, regardless of their remoteness from the place of trial, where the party desiring the subpoena shows good cause and pays the expenses the witness incurs in attending to the subpoena. Neb. Rev. Stat. § 25-1227(2) (Reissue 1989). Moreover, the disjunctive language of rule 32 allows the admission of the deposition where the deponent is more than 100 miles away from the place of trial, regardless of the use of "process or other reasonable means" to secure the deponent's appearance. Thus, application of rule 32 alone would allow the use of the deposition of a person amenable to process, or whose attendance might be obtained through other reasonable means. This would not comply with § 27-804(2)(a).

The plaintiff's position, then, implicitly requires that this court ignore § 27-804 and treat rule 32 as an independent basis for the admissibility of the deposition. This mirrors the majority position of the federal courts in applying the federal counterparts to § 27-804 and rule 32. 8 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure: Civil § 2143, 452-53 (1970) ("[federal] Rule 32 . . . creates of its own force an exception to the hearsay rule"); *Schneider v. TRW, Inc.*, 938 F.2d 986 (9th Cir. 1991) (O'Scannlain, J., dissenting); *Carey v. Bahama Cruise Lines*, 864 F.2d 201 (1st Cir. 1988); *Sundstrand Corp. v. Sun Chemical Corp.*, 553 F.2d 1033 (7th Cir. 1977); *U. S. v. Intern. Business Machines Corp.*, 90 F.R.D. 377 (S.D.N.Y. 1981). However, a minority of federal courts have held that

both the federal hearsay rule and the federal discovery rule must be complied with in order that a deposition be admissible. *Schneider v. TRW, Inc., supra; Henkel v. XIM Products, Inc.,* 133 F.R.D. 556 (D. Minn. 1991); *Budden v. U.S.,* 748 F. Supp. 1374 (D. Neb. 1990); *In re Air Crash Disaster at Stapleton Intern.,* 720 F. Supp. 1493 (D. Colo. 1989). Implicit in each of the two federal positions is the fact that a deposition, offered at trial as substantive evidence, is hearsay, inadmissible without either the independent hearsay exception created by Fed. R. Civ. P. 32(a)(3) or the hearsay exception created by Fed. R. Evid. 804(b)(1).

Moreover, the resolution of the conflict in rules reached by the majority of federal authorities is not helpful in resolving the conflict in the Nebraska rules. This court has previously looked to the federal rules for guidance in applying both the Nebraska Evidence Rules and this court's rules of discovery. *Sikyta v. Arrow Stage Lines,* 238 Neb. 289, 470 N.W.2d 724 (1991). In this instance, however, the federal majority position is a result of the relationship between the Federal Rules of Evidence and the Federal Rules of Civil Procedure, and the same relationship does not exist between the corresponding Nebraska rules. Therefore, the same result does not obtain.

Fed. R. Evid. 802 prohibits hearsay "except as provided by these rules or by other rules prescribed by the Supreme Court pursuant to statutory authority or by Act of Congress." The committee comment to Fed. R. Evid. 802 cites Fed. R. Civ. P. 32 as an example of a hearsay exception outside the rules of evidence. Likewise, Fed. R. Civ. P. 32, in its committee comment, states in part:

A change is made in new Rule 32(a), whereby it is made clear that the rules of evidence are to be applied to depositions offered at trial as though the deponent were then present and testifying at trial. This eliminates the possibility of certain technical hearsay objections which are based, not on the contents of deponent's testimony, but on his absence from court.

The intent of Congress, then, expressed in both the federal hearsay prohibition and the federal discovery rule, is that the discovery rule creates an independent hearsay exception for

depositions.

In contrast, Neb. Rev. Stat. § 27-802 (Reissue 1989), prohibits hearsay "except as provided by these rules or by other rules *adopted by the statutes of the State of Nebraska*." (Emphasis supplied.) The Nebraska hearsay rule does not provide for exceptions created by rules of court. This is consistent with the Nebraska Constitution, which states that "the supreme court may promulgate rules of practice and procedure for all courts . . . not in conflict with laws governing such matters." Neb. Const. art. V, § 25. It is further consistent with Neb. Rev. Stat. § 25-1273.01 (Reissue 1989), which states, "The Supreme Court shall promulgate rules of procedure for discovery in civil cases, which rules shall not be in conflict with laws governing such matters."

Fed. R. Civ. P. 32, then, creates an exception to the federal hearsay rule because that is what Congress, in enacting and amending the rule, intended. It is irrelevant whether this court intended a similar exception in promulgating Neb. Ct. R. of Discovery 32. Under the Nebraska Constitution, and under the enabling legislation, this court had no power to create in the Nebraska discovery rules an independent exception to the hearsay prohibition of § 27-802. Therefore, in order to be admissible, a deposition must satisfy the requirements of § 27-804(2)(a).

In most cases, the application of § 27-804 will not create different conditions for admissibility than does Nebraska discovery rule 32. The occurrence witness, whose appearance is obtainable only through process, is not required to travel more than 100 miles to attend to subpoena, absent a showing of cause. See § 25-1227. Any such witness residing more that 100 miles from the court may thus testify by deposition. It is only in the extraordinary case where a witness can be compelled to attend subpoena anywhere in the state, see § 25-1227(2), or in the case where the proponent of the witness' deposition has some other reasonable means of obtaining the witness' attendance—for example, the paid expert or the party employee witness—that § 27-804 will bar a deposition admissible under rule 32 in the absence of the hearsay rule.

However, in this case, § 27-804(1)(e) bars the admission of

the deposition because the plaintiff, the proponent of the deposition testimony, did not show that he was unable to procure the attendance of the witness by "other reasonable means." Berg was, on the stipulated facts, beyond the court's subpoena power, as he resided outside of the state. See § 25-1227. However, Maresh designated Berg as his expert witness. At a pretrial conference, Maresh indicated that he intended to call Berg as his expert witness, even after Oelkers—who had originally retained Berg—had settled and was no longer a defendant. At trial, Maresh indicated that he had paid a third of Berg's costs. Accordingly, Berg was Maresh's paid witness, so clearly, in the absence of a further showing to the contrary by the plaintiff, there were "other reasonable means" available to secure Berg's appearance.

The only showing made prior to the admission of the Berg deposition was the stipulation that Berg resided more than 100 miles from the place of trial and also resided outside the state. This, by itself, is inadequate under § 27-804 to show unavailability.

Indeed, it would seem unreasonable not to require the party calling an expert—which party can secure the expert's presence by paying him or her—to make an effort to have the witness in court. The unavailability requirement of § 27-804 reflects the strong policy favoring live testimony, with full cross-examination and the opportunity to view the demeanor of the witness. 2 McCormick on Evidence, ch. 31, § 301 (John W. Strong 4th ed. 1992), citing *United States v. Inadi*, 475 U.S. 387, 106 S. Ct. 1121, 89 L. Ed. 2d 390 (1986).

This is not to say, however, that an expert witness' deposition testimony is never admissible under § 27-804. In determining whether to admit such evidence, the trial court may consider

"the stakes in the litigation, the relative resources of the parties, the importance of the declarant's statement in the suit, the foreseeability of need for the statement, and the relative expense and difficulties which would be encountered in securing the declarant's trial or deposition testimony . . . ." 4 Louisell and Mueller, [Federal Evidence] § 486, pp. 1066-1068 [1980].

*Williams v. Collins Communications, Inc.*, 720 P.2d 880, 888

(Wyo. 1986). See, also, *Carter-Wallace, Inc. v. Otte*, 474 F.2d 529 (2d Cir. 1972) (admission of prior testimony not an abuse of discretion because the proponent's insolvency made any attempt to secure the voluntary appearance of his expert futile). Other examples of unavailability might be that the witness' attendance is obtainable only through financial hardship on the proponent, that the expense to produce the witness may be prohibitive, that hostility or animosity on the part of the witness may prevent attendance at trial, or that other circumstances may demonstrate that the proponent lacks "reasonable means" to produce or compel the witness' attendance at trial.

The burden to establish the declarant's unavailability is on the party seeking to introduce evidence, pursuant to § 27-804. See, *Muilenberg v Upjohn Co.*, 169 Mich. App. 636, 426 N.W.2d 767 (1988); McCormick on Evidence, *supra*, ch. 24, § 253. See, also, *State v. Bothwell*, 218 Neb. 395, 355 N.W.2d 506 (1984). Whether the effort to obtain the presence of the witness would have been successful or practicable, and therefore whether Berg truly was unavailable as a witness, was within the discretion of the trial court, whose ruling normally will be upheld on appeal in the absence of an abuse of that discretion. *Sikyta v. Arrow Stage Lines*, 238 Neb. 289, 470 N.W.2d 724 (1991).

Since § 27-804(1)(e) was not involved in *Sikyta* and, therefore, *Sikyta* did not examine any conflict between it and rule 32(a)(3)(E) (exceptional circumstances may make the use of a deposition desirable), *Sikyta* should not be misinterpreted as a suggestion that rule 32 takes precedence over § 27-804(1)(e) regarding introduction of a deposition on the basis of a witness' unavailability. However, our holding here today is not necessarily antagonistic to *Sikyta*, as this issue was never directly addressed there.

> Arrow would be hard pressed to show deprivation of a substantial right or prejudice in light of the verdict favorable to Arrow. For that reason, we decline to delve further into the question about a proper procedure for showing that a witness is unavailable within the purview of Rule 32(a)(3)(E).

*Sikyta*, 238 Neb. at 309, 470 N.W.2d at 736. Therefore, construing *Sikyta* to mean that rule 32(a)(3)(E) takes precedence over § 27-804(1)(e) is a misreading of *Sikyta* and would be disapproved as contrary to our holding today.

Because of our holding that the deposition was inadmissible, we need not address the State's other contention that the deposition was inadmissible because it was taken for discovery only, except to note that the federal courts, whether applying Fed. R. Civ. P. 32 alone or that rule in conjunction with Fed. R. Evid. 804(b)(1), have universally rejected a "discovery-use" dichotomy as a criterion for the admissibility of a deposition. *Tatman v. Collins*, 938 F.2d 509 (4th Cir. 1991); *Polys v. Trans-Colorado Airlines, Inc.*, 941 F.2d 1404 (10th Cir. 1991); *Henkel v. XIM Products, Inc.*, 133 F.R.D. 556 (D. Minn. 1991); *U. S. v. Intern. Business Machines Corp.*, 90 F.R.D. 377 (S.D.N.Y. 1981).

However, the erroneous admission of the Berg deposition does not necessarily require reversal. "In a civil case, to constitute reversible error . . . admission or exclusion of evidence must unfairly prejudice a substantial right of a litigant complaining about such evidence admitted or excluded." *Rose v. City of Lincoln*, 234 Neb. 67, 76, 449 N.W.2d 522, 529 (1989). Generally, erroneous admission of evidence provides no prejudice in a bench trial " 'if there is sufficient competent and relevant evidence in the record to sustain the judgment.' " *Jeffres v. Countryside Homes*, 220 Neb. 26, 29, 367 N.W.2d 728, 731 (1985). We therefore examine the remaining record to determine whether the admissible evidence was sufficient to support the judgment of the district court.

The State's duty to warn travelers of hazards adjacent to the traveled roadway was established by *Clouse v. County of Dawson*, 161 Neb. 544, 74 N.W.2d 67 (1955). In that case, the plaintiff sued after he drove his car off a county road and into a canyon 10 feet beyond the road's edge. This court denied the plaintiff recovery on the basis that the canyon was not a foreseeable hazard, assuming that drivers exercised due care. In so holding, this court stated,

> The duty of a county to warn against dangerous places or hazards beyond the limits of the highway exists only where

such places are substantially joining the highway, or in such close proximity thereto as to be in themselves dangerous, under ordinary circumstances, to travelers thereon who are using reasonable care.

*Id*. at 552, 74 N.W.2d at 73.

*Clouse* establishes the duty of the State, since the liability of the State for failure to maintain highways is the same as comparable liability of counties. See § 81-8,219(2). Additionally, it cannot be denied that a sharp shoulder drop-off is one of the "dangerous places or hazards" which "substantially [join] the highway," *Clouse*, 161 Neb. at 552, 74 N.W.2d at 73. It is by definition immediately adjacent to the highway. Moreover, this court has recognized that highway "travelers . . . who are using reasonable care," *id*., may stray onto the shoulder. In *Koncaba v. Scotts Bluff County*, 237 Neb. 37, 464 N.W.2d 764 (1991), and *Oldenburg v. State*, 221 Neb. 1, 374 N.W.2d 341 (1985), drivers were injured after driving their vehicles off sharp shoulder dropoffs. This court denied recovery in each case based upon the contributory negligence of the driver. In both cases, the court analyzed the individual negligent acts of the driver; it did not assume that any driver who strayed onto the shoulder was negligent. If it is not negligence per se to stray onto the shoulder, then by definition, at least some drivers "who are using reasonable care," *Clouse*, 161 Neb. at 552, 74 N.W.2d at 73, may find themselves on the shoulder. A sharp edge dropoff is, therefore, a condition of which, under *Clouse*, the State has a duty to warn.

The State undertook two measures to warn drivers traveling over the Highway 30 project of the edge dropoff. First, the State erected large yellow-orange signs stating, "Sharp Drop-off at Pavement Edge." Oelkers would have passed no fewer than six of these signs in driving westward over the project to the site of the accident. Second, the State erected "Type 2" object markers—6- by 12-inch reflective yellow panels, raised on posts, mounted 6 to 18 inches outside the edge of the pavement—every 300 feet. It therefore becomes necessary to analyze the adequacy of these measures to determine negligence, if any, on the part of the State under the rules and regulations embodied by the manual. See, § 39-698;

411 Neb. Admin. Code, ch. 1, § 001.01; *Raben v. Dittenber*, 230 Neb. 822, 434 N.W.2d 11 (1989).

Several sections of the manual deal with the particular situation presented in this case. Part VI deals with "Traffic Controls for Street and Highway Construction and Maintenance Operations." Subsection (1)(a) under § 6A-5, headed "Fundamental Principles," states:

> The basic safety principles governing the design of permanent roadways and roadsides should also govern the design of construction and maintenance sites. The goal should be to route traffic through such areas with geometrics and traffic control devices as nearly as possible comparable to those for normal highway situations.

Section 3A-5 of the manual provides that, on finished roads, an unbroken white line should be used to "mark the right edge of the pavement." In the same manner, Section 3B-6, headed "Pavement Edge Lines," states:

> Pavement edge line markings provide an edge of pavement guide for drivers. They have a unique value as a visual reference for the guidance of drivers during adverse weather and visibility conditions. They also may be used where edge delineation is desirable to reduce driving on paved shoulders or refuge areas of lesser structural strength than adjacent pavement. . . .
>
> Edge lines *shall* be provided on all Interstate highways, on rural multilane divided highways, and *may* be used on other classes of roads.

(Emphasis supplied.)

The manual, then, provides that highways under construction be marked the same as completed highways, at least as nearly as is practicable. Completed highways may have white lines marking the right edge of the traffic lane, and in fact Highway 30 was to have such lines upon completion. The State reasonably could have required the contractor to provide a temporary white edge line. Temporarily marking both outside edges of the highway with a white line would have cost $12 per 100 feet of highway. However, the State failed to take this precaution.

The manual also provides specifically for markers to protect

drivers from pavement edge dropoffs on completed highways. Section 3C-3 states:

> Objects not actually in the roadway may be so close to the edge of the road that they need a marker. . . . In some cases there may not be a physical object involved, but other roadside conditions such as *narrow shoulder drop-offs*, gores, small islands and abrupt changes in the roadway alignment may make it undesirable for a driver to leave the roadway. Type 2 or 3 object markers are intended for use at such locations. *The inside edge of the marker shall be in line with the inner edge of the obstruction.*

(Emphasis supplied.) A Type 2 object marker is defined in § 3C-1 as "an all yellow reflective panel, 6" x 12"."

The State did indeed require the contractor to erect Type 2 object markers, and the contractor did in fact erect them. However, the State's standard specifications, and the project plans drawn from them, provide that the markers be placed not at the edge of the dropoff, but 6 to 18 inches outside of the edge. In fact, it appears from the evidence that most of the markers actually in place were nearer to 18 inches from the edge than to 6 inches from the edge.

In addition to these standards for completed highways, the manual specifically provides measures to protect highway users from hazards during construction. Section 6C deals with "Barricades and Channelizing Devices." Section 6C-1 states:

> The function of channelizing devices are [sic] to warn and alert drivers of hazards created by construction or maintenance activities in or near the traveled way, and to guide and direct drivers safely past the hazards. Channelizing devices as used herein includes [sic] but is [sic] not limited to cones, vertical panels, drums, barricades, and barriers.

The manual depicts and specifies the proper channelizing devices. Plastic cones, plastic drums, and barricades may all be set on the surface of a roadway to delineate the proper path and to mark a hazard.

The Traffic Control Devices Handbook (1983), another Federal Highway Administration publication, which is

"primarily intended to augment," handbook at 1-1, the manual, specifically addresses "Pavement Dropoffs." The handbook prescribes that "[d]ropoffs should be kept to a minimum in frequency, duration, and depth." Handbook at 6-20. The handbook further states, "Where excessive dropoffs are necessary it may be possible to close the adjacent lane with appropriate channelizing devices." Handbook at 6-21.

The handbook makes it clear that a shoulder dropoff is a hazard "created by construction or maintenance activities in or near the traveled way," as contemplated by § 6C-1 of the manual. The manual prescribes that channelizing devices be used to guide drivers away from such hazards. In this case, the design of the Highway 30 project would have facilitated the use of channelizing devices to mark the edge dropoff. The pavement throughout the project, including at the site of the accident, was 29 feet wide. Each traffic lane was 12 feet wide, leaving a paved shoulder of $2^1/_2$ feet, upon which the State could have required that channelizing devices be erected. The record does not indicate that any such devices were either required by the State or used by the contractor, nor did the State require the use of edge lines which, although not required by the manual on this particular class of highway, nevertheless are suggested precautions.

The evidence shows that the State did not comply with the manual, which constitutes its own regulations. Ordinarily, a violation of a statute or regulation is not negligence per se, but is only evidence of negligence. *Vanek v. Prohaska*, 233 Neb. 848, 448 N.W.2d 573 (1989). The measures the State did undertake, however, further indicate its negligence. The State attempted to delineate the dropoff with the Type 2 object markers. The manner in which the Type 2 object markers were used is deficient in two ways.

First, by marking a line $1^1/_2$ feet from the actual edge of the pavement, the markers create the impression that the inside edge of the hazard they mark, the dropoff, is further from the lane of traffic and the driver who is using it than it actually is. It is common sense that if one is marking a hazard, the only effective way to do so is to place the marker between the hazard and those one is seeking to protect. The State's actions here,

however, ignore this conclusion.

Second, the location of the markers makes more likely the precise type of accident which occurred here. The parties have throughout this case been in substantial agreement as to the proper procedure when one drives inadvertently off the edge of the pavement—slow the vehicle down and attempt reentry when the highway is clear. Locating markers on steel posts so near the highway that an auto traveling with its right wheels on the shoulder may strike them—neither so near as to provide positive guidance as to the location of the highway edge, nor so far as not to themselves constitute a hazard—urges the driver to try immediately to reenter the highway, with the possibility of dire consequences such as those that ensued here. Indeed, there was an object marker directly adjacent to the westbound lane at the scene of the accident.

The State's failure to comply with its own manual as to channelizing device, edge markers, or placement of the object markers "in line with the inner edge of the obstruction," in light of the circumstances presented in this case, is sufficient evidence of breach of duty that it cannot be said the district court was clearly incorrect. See *Koncaba v. Scotts Bluff County*, 237 Neb. 37, 464 N.W.2d 764 (1991).

We turn next to the issue of proximate cause.

" 'There are three basic requirements in establishing proximate cause. The first requirement is that the negligence be such that "without which the injury would not have occurred," commonly known as the "but for" rule. . . .

" 'The second requirement is that the injury be the natural and probable result of the negligence. . . .

. . . .

" 'The third requirement is that there be no efficient intervening cause.' "

*Zeller v. County of Howard*, 227 Neb. 667, 672, 419 N.W.2d 654, 658 (1988).

The State's first causation argument is aimed at the first prong of the proximate cause test set out above—the "but for" causation. The State argues that since Oelkers' testimony about the occurrence of the accident was excluded, there is no

evidence to show how the accident occurred and, consequently, whether the State's failure to warn of the dropoff was in fact a cause of the accident. This argument is unsupported by the evidence. The record makes it clear that the accident occurred when Oelkers dropped the two right tires of his car off the edge of the pavement onto the unpaved shoulder. Oelkers, in attempting to reenter the highway, oversteered and veered across the highway into oncoming traffic. The decedent, along with the other deceased passengers, was ejected from Oelkers' car in the ensuing crash. This account of the accident is largely based upon the evidence provided by the State Patrol officers who investigated the accident.

" 'Determination of causation is, ordinarily, a matter for the trier of fact.' " *Id*. In this case, the district court could find that any of the reasonable precautions the State failed to take—providing an edge line, placing the object markers nearer to the dropoff, putting up barricades or drums—would have in some measure reduced the likelihood of this accident. Therefore, the district court could find that the failure to take these precautions contributed to the accident. Based upon the evidence as to how the accident took place, the district court's determination that the State's failure to warn was a contributing "but for" cause is not clearly incorrect. See *Koncaba v. Scotts Bluff County, supra*.

The State's other argument with regard to causation is aimed at the " ' "requirement . . . that there be no efficient intervening cause." ' " *Zeller v. County of Howard*, 227 Neb. at 672, 419 N.W.2d at 658. The State argues that Oelkers' own negligence was the sole proximate cause of the accident. While Oelkers' negligence may have been greater than slight in comparison to the State's negligence (a question we do not answer)—whereby it may have defeated his own right to recover—this fact would be irrelevant to the right of recovery of his passengers. See *Richardson & Gillispie v. State*, 200 Neb. 225, 263 N.W.2d 442 (1978) (even if driver was contributorily negligent in driving off edge dropoff, his passengers might still recover). Therefore, the only issue presented by Oelkers' negligence is whether it was an efficient intervening cause.

" ' "[A]n efficient intervening cause is new and independent

conduct of a third person, which itself is the proximate cause of the injury in question and breaks the causal connection between original conduct and the injury. . . ." ' " *Looney v. Pickering*, 232 Neb. 32, 37, 439 N.W.2d 467, 471 (1989). Where the defendant's action is itself a cause of the injury and the third party's negligent act is reasonably foreseeable, the third party's negligence is not an efficient intervening cause as a matter of law. See *id*. However, if the defendant's conduct constitutes merely passive negligence, which creates a condition which facilitates injury through subsequent third-party negligence, the third-party negligence is an efficient intervening cause. *Delaware v. Valls*, 226 Neb. 140, 409 N.W.2d 621 (1987).

*Zeller v. County of Howard* resolves the "cause or condition" issue here. In *Zeller*, the plaintiff and her decedent were involved in an auto accident on a county road. The accident occurred at an intersection where the decedent driver's view was blocked by a knoll, and a stop sign at which the decedent would have been obligated to stop had been knocked down. The plaintiff passenger and her decedent were struck, while in the intersection, by a car which came from behind the knoll. This court denied recovery because the decedent driver, had he been exercising due care, would have entered the intersection with appropriate caution because of the knoll, regardless of the presence or absence of the stop sign. The court held that the driver's negligence was unforeseeable, and thus, recovery was barred.

In contrast to *Zeller*, there is nothing in this case to indicate that Oelkers' negligence was not foreseeable. Inadvertent straying onto the shoulder is a foreseeable activity. *Koncaba v. Scotts Bluff County*, 237 Neb. 37, 464 N.W.2d 764 (1991); *Oldenburg v. State*, 221 Neb. 1, 374 N.W.2d 341 (1985); *Clouse v. County of Dawson*, 161 Neb. 544, 74 N.W.2d 67 (1955). Oelkers' excessive speed, which the State emphasizes, does not in and of itself serve to render his negligence in running off the road not foreseeable. See *Koncaba v. Scotts Bluff County, supra* (in highway dropoff case, plaintiff's decedent's excessive speed served to render him contributorily negligent as a matter of law, but not to make State's negligence not a proximate cause of accident). Therefore, even assuming Oelkers' contributory

negligence, the district court did not err in finding negligence on the part of the State which was a proximate cause of the accident.

Finally, we consider the State's claim that its alleged negligent acts or omissions were discretionary functions for which it is shielded from liability by § 81-8,219(1)(a). That section exempts from the State Tort Claims Act

[a]ny claim based upon an act or omission of an employee of the state, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a state agency or an employee of the state, whether or not the discretion be abused.

The plaintiff argues that the State's discretionary function argument is neutralized by § 81-8,219(2), which states:

With respect to any tort claim based on the alleged insufficiency or want of repair of any highway or bridge on the state highway system, it is the intent of the Legislature to waive the state's immunity from suit and liability . . . . It is the further intent of the Legislature that the words insufficiency or want of repair shall refer to a spot or localized highway defect and shall not . . . refer to the general or overall condition of a highway.

We address that argument.

Section 81-8,219(2) waives the State's immunity to suit "[w]ith respect to any tort claim based on the alleged insufficiency or want of repair of any highway or bridge on the state highway system." *Richardson & Gillispie v. State*, 200 Neb. 225, 263 N.W.2d 442 (1978), was a suit under the State Tort Claims Act for the State's failure to adequately maintain the highway shoulder. In *Richardson & Gillispie*, the plaintiffs' truck overturned after dropping its right front wheel off a 4- to 6-inch shoulder dropoff. This court held that § 81-8,219(2)—and previous court decisions regarding the liability of counties for shoulder maintenance, which the section incorporates—created in the State a duty to adequately maintain the highway shoulder. This court further rejected the

State's contention that the condition of the shoulder was part of the "general or overall condition of the highway." *Richardson & Gillispie*, 200 Neb. at 231-32, 263 N.W.2d at 446.

*Richardson & Gillispie* establishes that suits for failure to properly maintain the shoulder are within § 81-8,219(2). Liability in this case, however, was based on the State's failure to adequately warn of an unsafe shoulder. The question is whether failure to warn of an edge dropoff is an "insufficiency . . . of any highway" for which § 81-8,219(2) allows a claim.

As noted above, *Clouse v. County of Dawson, supra*, held that a county maintaining a road has a duty to warn of hazards immediately adjacent to the road. The Legislature, in subjecting the State to liability under the terms of § 81-8,219(2), explicitly directed courts to the jurisprudence of claims in existence against the counties at the time the State Tort Claims Act went into effect. Section 81-8,219(2) states that "[t]he Legislature further declares that judicial interpretations . . . governing the liability of counties on December 25, 1969, also shall be controlling on the liability of the state for the alleged insufficiency or want of repair of any highway or bridge." *Clouse* notes that the only liability of the county in that case was statutory. Therefore, if *Clouse* allows suits against a county for hazards adjacent to the roadway, § 81-8,219(2) allows a similar suit against the State.

However, we need not decide whether the facts of this case are within the immunity waiver of § 81-8,219(2). The discretionary function exception to the State Tort Claims Act clearly does not apply here.

"The discretionary function exception is inapplicable to a claim under the State Tort Claims Act if a statute, regulation, or policy specifically prescribes a course of governmental action or conduct." *Security Inv. Co. v. State*, 231 Neb. 536, 546, 437 N.W.2d 439, 446 (1989) (exception applied where state officials made policy decisions not to investigate failing savings institution). "In other words, the State is liable for negligence of its employees at the operational level, where there is no room for policy judgment." *Wickersham v. State*, 218 Neb. 175, 180, 354 N.W.2d 134, 139 (1984) (exception did not apply where state employees failed to follow state regulations regarding

brucellosis testing).

The manual is a set of state regulations that prescribes specific courses of action to be taken in marking a pavement edge dropoff. Those state employees who planned and executed the Highway 30 project were not at liberty to exercise their own policy judgment and deviate from the manual. There can therefore be no discretionary function immunity in this case. Having adopted rules and regulations, the State is not free to disregard them and then hide from liability behind discretionary function immunity.

This court has previously addressed the limits of discretionary immunity in the context presented here. In *Richardson & Gillispie, supra*, the court held that the plaintiff could not recover for negligence in the design of the highway, as the State's design decisions were discretionary functions. In that case, the court allowed recovery for failure to maintain the highway shoulder. This indicates that design is not actionable, as it involves discretionary decisions, but maintenance is actionable, as it does not. Properly warning drivers of a dangerous condition seems more akin to maintenance, where decisions are made at the operational level without policy implications, than to design, where policy considerations are more prevalent. Therefore, failure to warn would be actionable, as it embodies no discretionary functions, and the doctrine of state immunity does not apply.

The judgment of the district court is affirmed.

AFFIRMED.

GRANT, J., not participating.