783 N.W.2d 438 (2010)
279 Neb. 974
Muriel D. WALTON, appellant,
v.
Arun-Angelo PATIL, M.D., appellee.
No. S-08-618.
Supreme Court of Nebraska.
June 11, 2010.
*440 Marvin O. Kieckhafer and R. Laubenthal, of Smith Peterson Law Firm, L.L.P., for appellant.
Patrick G. Vipond and William R. Settles, of Lamson, Dugan & Murray, L.L.P., for appellee.
HEAVICAN, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.
PER CURIAM.

NATURE OF CASE
Muriel D. Walton sued Arun-Angelo Patil, M.D., alleging that he breached the applicable standard of care during and after a surgical procedure Patil performed on Walton's lower back. Before trial, Walton notified the court that she intended to enter into evidence the deposition testimony of her expert witness, Leon J. Ravvin, M.D. This deposition was taken by Patil's counsel. Patil objected to the use of the deposition, and on April 9, 2008, 5 days before a trial on the merits, the court announced its decision to disallow Ravvin's deposition because it was taken for discovery purposes only. Walton filed a motion to continue trial, which was also denied by the court. The district court entered a directed verdict in favor of Patil, from which Walton has perfected this appeal.

*441 BACKGROUND

EVENTS LEADING UP TO SUIT
In 2003, Walton was injured in an automobile accident. Following the accident, Walton complained of persistent back and right leg pain, for which she sought medical treatment from Patil. An MRI scan of her lumbar spine revealed moderately severe L4-5 spinal stenosis with facet hypertrophy. On July 2, 2003, Patil performed a surgical procedure known as an L4-5 decompressive laminectomy (L4-5 procedure) in an attempt to relieve Walton's pain. About 5 days after the L4-5 procedure, Walton experienced cerebrospinal fluid (CSF) leakage and swelling at the surgical site. She also developed severe positional headaches. Walton testified at her deposition that her pain did not decrease after the L4-5 procedure.
Walton went to see Patil and informed him of her symptoms. Patil recommended that Walton wait it out, and he sent her home. Walton's symptoms persisted, and she went to see Patil for a second time. According to Walton, "[Patil] just acted like he didn't see no problem." Walton testified that she "started going to see different doctors, because every time I would go see Patil he would just send me home and tell me to come back later. It's swelling. It will go away."
In July and August 2003, Patil attempted to treat Walton's condition with a "blood patch." However, this procedure was not successful. On October 9, Walton was admitted to the University of Nebraska Medical Center for surgical intervention. At the medical center, Patil performed two surgical procedures on Walton to repair the leak. The first procedure took place on October 9, and the second took place on October 14. Patil did not find the source of the leakage during either procedure, and he did not place a drain during either procedure. Because Walton was experiencing persistent CSF drainage after the first procedure, Patil attempted to have a lumbar drain inserted nonsurgically. According to Ravvin, this was "`unsuccessful'" and Walton continued to experience pain. Walton was discharged from the hospital on October 20, 2003.
Two days after being discharged, Walton was readmitted to the hospital from October 23 through 29, 2003, for symptoms of headache, vomiting, fever due to meningitis, and CSF leakage. By early November, the surgical wound in Walton's back sealed, but she developed a pseudomeningocele that progressively enlarged.
Eventually, Walton came under the care of another surgeon. On December 23, 2003, this surgeon performed a surgical procedure to repair the pseudomeningocele and placed a lumbar drain. Walton recovered well from this procedure, but her back and bilateral leg pain never improved.

SUIT
On June 6, 2005, Walton filed suit against Patil and several other defendants. The other defendants were dismissed from the suit and are not involved in this appeal. Walton alleged that during the L4-5 procedure, the dural covering of her spinal cord was injured, resulting in a CSF leak. Walton also averred that Patil breached the applicable standard of care.
Walton designated Ravvin to be her expert witness against Patil. Ravvin is a neurosurgeon from Lexington, Kentucky. Patil requested the deposition of Ravvin and was advised that Ravvin's fee for giving deposition testimony would be $5,500 for 4 hours. Patil objected to Ravvin's fee, and on February 13, 2007, the court held a hearing regarding Patil's objection to Ravvin's fee. The court ordered Walton to *442 make Ravvin available for a deposition no later than March 30 for an hourly fee of $650 (not including any compensation for preparation) or at an hourly rate determined by Ravvin's adjusted gross income from physician services for the calendar year 2006, divided by 1,850 hours, whichever hourly rate is higher. On March 23, 2007, Patil's counsel deposed Ravvin. Nothing in the record indicates that the parties agreed to use the deposition at trial or that the parties anticipated using the deposition at trial.
In his deposition testimony, Ravvin testified that he was skeptical of the fact that Patil did nothing different in the October 14, 2003, procedure than he did in the October 9 procedure. Specifically, Ravvin was puzzled by the fact that Patil did not put a drain in at the second surgery to stop the leak. Additionally, Ravvin testified at his deposition that in his opinion, Patil deviated from the standard of care by failing to place the drain after Walton's second surgery.
A report summarizing Ravvin's opinions regarding Patil's treatment of Walton was attached and used as a "template" throughout the deposition. In his deposition, Ravvin was asked, "Does this report which is your December 20th, 2006, letter contain all your opinions as to deviations from the standard of care by Dr. Patil?" to which Ravvin responded, "Yes." Ravvin also testified that the report was "an accurate statement of [his] opinions." Additionally, Ravvin testified that he had not changed any of his opinions as set forth in the report except that he incorrectly noted that a microscope was not used when in fact it was.
According to the report, Walton sought treatment several times from Patil but Patil "avoided the problem and did nothing." And in Ravvin's opinion, Walton should not have been discharged from the hospital on October 20, 2003, after the two surgical procedures. In conclusion, Ravvin stated:
[Walton] went through countless delays and three operations to repair CSF leakage and pseudomeningocele. She is left with persistent back and leg pain, both in her left and right legs. She may require further surgery in the future.
Dr. Patil's management deviated from the standard of care. This did cause harm to ... Walton which led to the complications as described.
The court scheduled the case for a jury trial to begin on April 14, 2008. On April 8, Walton filed a "Notice of Intent to Offer Deposition Testimony" of Ravvin at trial. She argued that the deposition was not excludable by the hearsay rule because it fell under an exception contained in Neb. Rev.Stat. § 27-804(1)(e) (Reissue 2008). Section 27-804(1)(e) provides that unavailability as a witness includes situations in which the declarant is absent from the hearing and the proponent of his statement has been unable to procure his attendance by process or other reasonable means. Walton maintained that Ravvin's deposition testimony was admissible because (1) Ravvin was not available to appear at the time of trial, (2) his attendance could not be procured by process, and (3) his attendance could not be procured by other reasonable means.
On April 9, 2008, Patil filed his objection to Walton's notice of intent to offer deposition testimony, alleging that Walton did not meet her burden of proof that Ravvin was unavailable to testify live at trial and that Ravvin's deposition testimony was hearsay. A hearing was held regarding the same, and at the hearing, the court sustained Patil's objection, disallowing the deposition to be read into evidence at trial.
Immediately after the court's ruling prohibiting the use of Ravvin's deposition at *443 trial, Walton filed a motion to continue trial in an attempt to have more time to arrange for Ravvin's testimony. On the morning of April 10, 2008, the court held a hearing regarding Walton's motion to continue. At the hearing, Walton asked the court to reconsider its decision regarding Ravvin's deposition testimony. Walton offered evidence to support her motion to continue and to support the use of Ravvin's deposition testimony.
Specifically, Walton introduced an affidavit of her attorney in support of allowing Ravvin's deposition testimony at trial. The affidavit indicated that Walton was financially unable to procure Ravvin's in-person testimony at trial or by video deposition. Additionally, Walton introduced several letters from Ravvin regarding his fees for taking a video deposition. These letters showed that Ravvin recently raised his fees for testifying as an expert witness. The letters from Ravvin showed that Ravvin's minimum fee for deposition testimony taken at his office was $7,500, which included 4 hours of his time. One letter, dated February 14, 2008, instructed Walton that if she wanted to depose Ravvin the first week of March, she must send payment to his office no later than February 19, and noted that the fee would be nonrefundable because Ravvin had to make schedule changes to accommodate the late request. On February 20, Ravvin sent a letter to Walton indicating that he was no longer available to testify in early March and that he only had a few dates left in March or April.
After considering the evidence, the court again denied Walton's request to read Ravvin's deposition testimony into evidence. The court reasoned that it was Walton's choice to designate Ravvin as an expert witness and that she did so knowing what his fees for testifying were. The court stated that hiring Ravvin "was a choice, an election that occurred in time back up the road a ways" and that therefore, Walton must take responsibility for that choice. Additionally, the court stated:
I didn't authorize the use of the discovery deposition because essentially a discovery deposition is just  is an affidavit. It's an effort to secure the opinions as comprehensively as an opponent can and to map out the basis, the factual basis for those opinions.
The purpose of the deposition is not to test those opinions and so what you're left with when it's a discovery deposition is essentially a statement of advocacy.
The court denied Walton's motion to continue, and after a discussion held off the record, the court adjourned.
Later that day, the case was called for trial. At that time, the parties agreed to bifurcate the trial so that liability was the only issue before the court. The parties also agreed that the court should consider Patil's motion for a directed verdict on the issue of liability after Walton presented evidence regarding her case in chief. Walton offered, and the court entered into evidence, her deposition testimony. Based on this evidence, the court sustained Patil's motion for a directed verdict, concluding that Walton failed to establish the existence of triable issues of fact on negligence and causation. Walton filed a motion for new trial, which was heard by the court on May 7, 2008. The court overruled the motion, and Walton appealed.
While this case was pending on appeal, Walton died. The action has since been revived by the personal representatives of Walton's estate.

ASSIGNMENTS OF ERROR
Walton argues that the district court erred in (1) disallowing Ravvin's deposition testimony from being entered into evidence at trial, (2) denying her motion to *444 continue trial, (3) granting Patil's motion for a directed verdict, and (4) denying her motion for new trial.

STANDARD OF REVIEW
A trial court's ruling in receiving or excluding an expert's opinion which is otherwise relevant will be reversed only when there has been an abuse of discretion.[1]
In reviewing a trial court's ruling on a motion for directed verdict, an appellate court must treat the motion as an admission of the truth of all competent evidence submitted on behalf of the party against whom the motion is directed; such being the case, the party against whom the motion is directed is entitled to have every controverted fact resolved in its favor and to have the benefit of every inference which can reasonably be deduced from the evidence.[2] A directed verdict is proper at the close of all the evidence only when reasonable minds cannot differ and can draw but one conclusion from the evidence, that is to say, when an issue should be decided as a matter of law.[3]
A judicial abuse of discretion exists when a judge, within the effective limits of authorized judicial power, elects to act or refrains from acting, and the selected option results in a decision which is untenable and unfairly deprives a litigant of a substantial right or a just result in matters submitted for disposition through a judicial system.[4]

ANALYSIS

RAVVIN'S DEPOSITION WAS ADMISSIBLE EVIDENCE
Walton contends that the district court abused its discretion in refusing to admit into evidence Ravvin's deposition testimony based on its conclusion that Walton failed to show that Ravvin was unavailable pursuant to § 27-804(1)(e) and (2)(a). Walton maintains that the deposition is admissible because Ravvin's attendance could not be procured by other reasonable means. For different reasons, we agree that Ravvin's deposition testimony was admissible.
Section 27-804(2)(a) of the Nebraska rules of evidence provides that a deposition may be admitted only if it was taken subject to cross-examination by the party opponent and only if the witness is unavailable. Unavailability, as relevant to the hearsay exception, requires that the deponent be "absent from the hearing and the proponent of his statement has been unable to procure his attendance by process or other reasonable means."[5]
But Neb. Ct. R. § 6-332 allows the admission of a deposition where the deponent is either more than 100 miles from the site of the trial or beyond the trial court's subpoena power at the time of trial. The disjunctive language of § 6-332 allows the admission of the deposition where the deponent is more than 100 miles away from the place of trial, regardless of the use of "process or other reasonable means"[6] to secure the deponent's appearance.
*445 In Maresh v. State,[7] we were confronted with the conflict between the Nebraska discovery rules and the Nebraska hearsay rules regarding the admission of deposition testimony at trial. In Maresh, the trial court allowed the deposition testimony of the plaintiff's expert witness to be read into evidence. The State argued that the trial court erred in this respect because the plaintiff did not make a preliminary showing of unavailability as required by § 27-804(2)(a). Conversely, the plaintiff argued that the deposition was properly admitted under the Nebraska discovery rules. The plaintiff maintained that because the deponent resided more than 100 miles from the trial court site, under what is now codified as § 6-332, his deposition testimony was admissible without further inquiry.
We held that under our rules, depositions were hearsay and, as such, were admissible only if they fit within a hearsay exception.[8] We explained that the unavailability requirement of § 27-804 must be read into § 6-332 so that an independent exception to the hearsay rule was not created by the Nebraska discovery rule.[9] Therefore, we concluded that to be admissible under the Nebraska discovery rule, the requirements of § 27-804 must also be met, and a mere showing that the deponent lived farther than 100 miles from the trial and was beyond the subpoena power of the court was insufficient.
In so concluding, we reasoned that the court had no power, pursuant to Neb.Rev. Stat. §§ 27-802 and 25-1273.01 (Reissue 1989), to create in the Nebraska discovery rules an independent exception to the hearsay prohibition of § 27-802. At the time Maresh was decided, § 27-802 provided that hearsay is not admissible "except as provided by these rules or by other rules adopted by the statutes of the State of Nebraska." We noted that § 27-802 was consistent with § 25-1273.01, which then stated, "The Supreme Court shall promulgate rules of procedure for discovery in civil cases, which rules shall not be in conflict with laws governing such matters."
But in 2000, the Legislature amended §§ 27-802[10] and 25-1273.01.[11] Section 27-802 was amended to read, "Hearsay is not admissible except as provided by these rules, by other rules adopted by the statutes of the State of Nebraska, or by the discovery rules of the Supreme Court." Section 25-1273.01 was amended by adding the following italicized language: "The Supreme Court shall promulgate rules of procedure for discovery in civil cases, which rules shall not be in conflict with laws governing such matters. Rules which provide for the admissibility of depositions shall not be considered as conflicting with the Nebraska Evidence Rules." (Emphasis supplied.)
We adhere to the general presumption that the Legislature, in adopting an amendment, intended to make some change in the existing law and that we should give effect to that change.[12] Furthermore, in construing a statute, appellate courts are guided by the presumption that the Legislature intended a sensible rather than absurd result in enacting the *446 statute.[13] An appellate court will place a sensible construction upon a statute to effectuate the object of the legislation, as opposed to a literal meaning that would have the effect of defeating the legislative intent.[14] In construing a statute, a court must look to the statutory objective to be accomplished, the evils and mischiefs sought to be remedied, and the purpose to be served, and then must place on the statute a reasonable or liberal construction that best achieves the statute's purpose, rather than a construction that defeats the statutory purpose.[15]
The language added to § 25-1273.01, in combination with the amendment made to § 27-802, indicates a clear intention by the Legislature to abrogate the holding in Maresh that the Nebraska Rules of Discovery do not create an independent avenue to admit deposition testimony. Based on these amendments, the Legislature validated § 6-332, which allows deposition testimony to be admitted independent of the Nebraska hearsay rule. In other words, § 6-332 creates an exception to the hearsay rule, and a deposition need no longer satisfy the requirements of § 27-804(2)(a) to be admissible under the rules of discovery. And when a party attempts to introduce deposition testimony under § 6-332, it is unnecessary to show that reasonable efforts were made to procure the attendance of the witness.
Based on the foregoing, we conclude the district court erred when it reasoned that the deposition was inadmissible because Walton failed to prove that Ravvin was unavailable. The fact that Ravvin is Walton's paid witness is irrelevant. Likewise, the fact that Walton could have chosen a less expensive witness is immaterial. Section 6-332 merely requires that the deponent reside more than 100 miles from the site of the trial, regardless of whether the proponent has made reasonable efforts to obtain the witness but could not do so. In the present case, it is undisputed that Ravvin resided more than 100 miles from the trial and was outside the court's subpoena power. Because this is all Walton was required to show to admit the deposition testimony under § 6-332, the district court erred in overruling her motion.
The district court also erred in concluding that the deposition was inadmissible because it was a "discovery deposition." Neither our rules nor the Federal Rules of Civil Procedure distinguish between a deposition taken for use at trial and one taken for discovery purposes.[16] In fact, the federal courts have universally rejected a "`discovery-use'" dichotomy as a criterion for the admissibility of a deposition taken during the discovery phases of a trial.[17] Nothing in the Nebraska rules of evidence or the rules of discovery makes such a distinction. Thus, a deposition taken during discovery may be used at trial so long as it is otherwise admissible.

HARMLESS ERROR
Patil argues that even if Ravvin's deposition and attached report had been admitted, the evidence would have remained insufficient to establish prima facie evidence of legal causation and that thus, *447 the failure to admit Ravvin's evidence was harmless error. We agree.
In his report, Ravvin opined that Patil's deviation from the standard of care caused "harm" to Walton, but the precise nature of that harm is not readily apparent from the report. Clarification was provided by Ravvin's subsequent deposition in which he was questioned about the opinions stated in his report. In the deposition, Ravvin testified that Patil's deviations from the standard of care decreased Walton's chances of a better outcome. But Ravvin did not testify that but for the deviations, a better outcome would have been probable. The distinction is significant. Opinions dealing with proximate causation in a medical malpractice action are required to be given in terms that express a probability greater than 50 percent.[18] While a 49-percent chance of a better recovery may be medically significant, it does not meet the legal requirements for proof of causation.[19]
Ravvin was critical of Patil for not utilizing a lumbar surgical drain in his attempts to repair the complication which developed from the initial surgery. But when asked if earlier placement of a drain would have made a difference in Walton's outcome, Ravvin responded, "It might have and I don't know. I can't say for sure. I would say that the earlier the drain was put in, the better it would be." When pressed on this point and asked specifically if he could state with reasonable medical certainty that proper placement of the drain would have resolved the pseudomeningocele, Ravvin replied, "I can't say with certainty. I think she would have had a better chance." Similarly, Ravvin could not say that Walton would not have developed meningitis if the drain had been placed sooner. Instead, he testified that if the drain had been placed earlier, there "would have been better management" of the meningitis. And Ravvin testified that the most probable cause of Walton's postoperative leg and back pain was the spinal condition for which the initial surgery was done, not any negligence on the part of Patil.
Given Ravvin's testimony that his causation opinion had not changed from the time of his report through the time of his deposition, the only reasonable inference that can be drawn is that the "harm" mentioned in his report is the same as that which he identified more specifically in his deposition: a decreased chance of a better medical outcome. Ravvin does not state in either his report or his deposition that Walton would probably have had a better outcome but for the negligence of Patil. This case does not present the circumstances of Neill v. Hemphill,[20] where an expert buttresses a prior equivocal opinion with a subsequent, more definite one. In that case, we held that the second opinion could be considered along with the first in resolving a motion for summary judgment. But here, no reasonable inference of legal causation can be drawn from the general "harm" language used in Ravvin's report when his subsequent testimony makes it clear that he was referring only to a loss of chance, not the probability of a different outcome.
For these reasons, the failure to admit Ravvin's deposition and attached report was harmless error. We affirm the judgment of the district court.
AFFIRMED.
*448 McCORMACK, J., dissenting.
I respectfully dissent. I believe that Ravvin's testimony in his report was made with the requisite level of certainty for expert testimony. And I believe the evidence was sufficient to overcome Patil's motion for directed verdict.
In his report, Ravvin listed several instances in which Patil deviated from the standard of care. Ravvin described how Patil had persistent CSF leakage after her first surgery, but that "Patil avoided the problem and did nothing." Ravvin explained how Patil then failed to find the source of the leak in two subsequent operations. Ravvin opined that Patil should have placed a lumbar drain and that he should have consulted with another neurosurgeon if he could not find the source of the CSF leakage on his own. Ravvin opined that Patil should have kept Walton at the hospital until the source of the leakage could be found.
Ravvin described how "[e]ven after two attempts at repair and a bout of meningitis the patient had persistent drainage and then recurrence of pseudomeningocele." Yet, "Patil still ignored the problem." Walton ultimately did not get any relief until she sought out another doctor who, Ravvin explained, performed "an easy repair" and placed a lumbar drain.
Ravvin stated quite clearly in his report that Patil's deviations from the standard of care "did cause harm to ... Walton which led to the complications as described." Unlike the testimony in Rankin v. Stetson,[1] relied upon by the majority, this statement by Ravvin is not expressed in terms of "chance" or "prognosis." Rather, it is expressed with absolute certainty. This more than satisfies the legal requirements for proof of causation.
The "harm" referred to in Ravvin's report should be interpreted from the report itself. It is unnecessary and illogical to interpret this statement in light of a deposition taken 3 months later. Ravvin stated that Patil's deviation from the standard of care had caused Walton harm "which led to the complications as described." Directly prior to this conclusion, Ravvin had described:
In summary ... Walton did develop complications of lumbar laminectomy viz CSF leak. This led to a pseudomeningocele, which in turn led to meningitis, and was followed by arachnoiditis. She went through countless delays and three operations to repair CSF leakage and pseudomeningocele. She is left with persistent back and leg pain, both in her left and right legs. She may require further surgery in the future.
In other words, the harm of which Ravvin opined was the delay and the unnecessary and unproductive surgeries that failed to correct a leak, which eventually led to meningitis, arachnoiditis, and persistent pain.
This is a case decided on a directed verdict. And, in that context, we must give Walton the benefit of every inference which can reasonably be deduced from the evidence.[2] The majority relies on the fact that in the deposition taken by opposing counsel, Ravvin's testimony is not so certain. The majority describes what Ravvin's statement of "harm" must really mean by relying on the deposition. But it is for the trier of fact to decide whether Ravvin's statements in his report or, instead, his later statements in his deposition *449 are to be believed. It was for the trier of fact to decide if Ravvin was being truthful when he testified that his opinion had not changed from the time of his report. Walton should not be deprived of her day in court because we believe Ravvin's deposition or because we assume that inconsistencies must be interpreted in a way that makes Ravvin's two statements cohesive.
Reasonable minds could differ as to whether Ravvin had an opinion, within a reasonable degree of certainty, that Patil's breach of the standard of care caused Walton harm. Furthermore, Ravvin's report and his deposition testimony provided sufficient evidence from which a trier of fact could determine what harm resulted. Accordingly, I believe the cause should be remanded for a trial on the merits.
NOTES
[1] Liberty Dev. Corp. v. Metropolitan Util. Dist., 276 Neb. 23, 751 N.W.2d 608 (2008).
[2] State of Florida v. Countrywide Truck Ins. Agency, 275 Neb. 842, 749 N.W.2d 894 (2008).
[3] LeRette v. American Med. Security, 270 Neb. 545, 705 N.W.2d 41 (2005).
[4] Incontro v. Jacobs, 277 Neb. 275, 761 N.W.2d 551 (2009).
[5] § 27-804(1)(e).
[6] Id.
[7] Maresh v. State, 241 Neb. 496, 489 N.W.2d 298 (1992).
[8] Id. See, also, Menkens v. Finley, 251 Neb. 84, 555 N.W.2d 47 (1996).
[9] Id.
[10] § 27-802 (Reissue 2008).
[11] § 25-1273.01 (Reissue 2008).
[12] See Underhill v. Hobelman, 279 Neb. 30, 776 N.W.2d 786 (2009).
[13] Foster v. BryanLGH Med. Ctr. East, 272 Neb. 918, 725 N.W.2d 839 (2007).
[14] Id.
[15] Id.
[16] See, Fed.R.Civ.P. 32; Tatman v. Collins, 938 F.2d 509 (4th Cir.1991); U.S. v. Intern. Business Machines Corp., 90 F.R.D. 377 (S.D.N.Y.1981); Rosenthal v. Peoples Cab Company, 26 F.R.D. 116 (W.D.Pa.1960).
[17] See Maresh v. State, supra note 7, 241 Neb. at 508, 489 N.W.2d at 308.
[18] Rankin v. Stetson, 275 Neb. 775, 749 N.W.2d 460 (2008).
[19] Id.
[20] Neill v. Hemphill, 258 Neb. 949, 607 N.W.2d 500 (2000).
[1] See Rankin v. Stetson, 275 Neb. 775, 786, 749 N.W.2d 460, 468 (2008).
[2] State of Florida v. Countrywide Truck Ins. Agency, 275 Neb. 842, 749 N.W.2d 894 (2008).